**BEECH CINEMA, INC., Twin Beech Cinema, Inc., Kisco Cinema, Inc. and Yorktown Heights Theatre, Inc., Plaintiffs-Appellees,**

v.

**TWENTIETH CENTURY–FOX FILM CORPORATION,**
**Defendant-Appellant.**

**No. 976, Docket 80–7021.**

United States Court of Appeals, Second Circuit.

Argued April 7, 1980.

Decided June 3, 1980.

Stanley Godofsky, New York City (Rogers & Wells, Guy C. Quinlan, Peter M. Dugre, New York City, of counsel), for defendant-appellant.

Jon M. Kaufman, New York City (Colton, Weissberg, Hartnick & Yamin, Alan J. Hartnick, Steven M. Gerber, New York City, of counsel), for plaintiffs-appellees.

Before FRIENDLY, FEINBERG and TIMBERS, Circuit Judges.

---

**3.** Horwitz would, of course, have the right to appeal from such a judgment.

**FEINBERG, Circuit Judge:**

Twentieth Century-Fox Film Corporation (Fox) appeals from a judgment entered in the United States District Court for the Southern District of New York, after a jury trial before Judge William C. Conner, that awarded plaintiffs treble damages for appellant's antitrust violations. Appellant's principal contention in this court is that because there was insufficient evidence at trial to support the jury's findings the district court should have granted appellant's motions for a directed verdict or for judgment notwithstanding the verdict. For the reasons stated below, we affirm the judgment of the district court.

I.

Appellant Fox is a major producer and distributor of motion pictures. Plaintiffs-appellees Beech Cinema, Inc., Twin Beech Cinema, Inc., Kisco Cinema, Inc., and Yorktown Heights Theatre, Inc. operate four movie theatres located in northern Westchester County, New York.[1] All four theatres are wholly owned by Ronald Lesser, a major protagonist in this litigation. The basis of plaintiffs' complaint is that defendant Fox conspired with General Cinema Corporation and General Cinema Corporation of New York (hereafter collectively referred to as General Cinema) to deprive plaintiffs of Fox films. General Cinema operates the largest circuit of theatres in the United States, including forty-three in the New York metropolitan area and nine in Westchester County. Five of these theatres are located in northern Westchester; their only substantial competition in that area comes from the four theatres operated by plaintiffs. Prior to 1975, Fox licensed various films to plaintiffs, while other Fox films were played by General Cinema's theatres. However, beginning approximately in January 1975, Fox ceased licensing films to plaintiffs, although it continued to deal with General Cinema's theatres. Plaintiffs complained about the cut-off, and suggested that Fox's conduct might constitute a violation of the antitrust laws. Fox responded that it had stopped distributing

pictures to plaintiffs because of the failure of Lesser to pay a $7,500 debt owed to Fox by Mountain Cinemas, Inc., a now defunct group of theatres in upstate New York of which Lesser was president and one-third owner.

Plaintiffs rejected Fox's proffered explanation for the cut-off and in October 1976 commenced the present antitrust action in the district court. The complaint alleged that Fox and General Cinema had entered into an unlawful conspiracy to deprive plaintiffs of the opportunity to obtain and play Fox films in the Westchester area. Plaintiffs settled their dispute with General Cinema, and in June 1979 the trial of plaintiffs' claims against Fox began. At the close of plaintiffs' case, Fox moved for a directed verdict, which the court declined to grant. Thereafter, the jury returned a verdict in favor of plaintiffs, which when trebled amounted to $136,779, in addition to costs and counsel fees of approximately $80,000. The district court subsequently denied Fox's motions for judgment notwithstanding the verdict and for a new trial, and this appeal followed.

Before this court, Fox contends that there was insufficient evidence at trial to allow a rational jury to conclude that Fox had conspired with General Cinema to deprive plaintiffs of the opportunity to obtain Fox films or that plaintiffs had been damaged. Fox also asserts that the district court's evidentiary rulings concerning the issue of damages were erroneous, thus requiring the grant of a new trial. We treat these contentions in separate sections.

II.

It is uncontested that beginning sometime in late 1974 or early 1975, Fox determined that it would no longer license pictures to plaintiffs. Such conduct, however, would not constitute a violation of the antitrust laws if Fox acted unilaterally in refusing to deal with plaintiffs. *Fuchs Sugars & Syrups, Inc. v. Amstar Corp.*, 602 F.2d 1025, 1030–31 (2d Cir.), *cert. denied*, 444 U.S. 917, 100 S.Ct. 232, 62 L.Ed.2d 172 (1979). Thus, the issue for the district

1. Beech Cinema, Inc. was merged into Twin Beech Cinema, Inc. subsequent to the commencement of this action.

**1108**

court in ruling on Fox's motions for a directed verdict and for judgment notwithstanding the verdict was whether the evidence produced at trial, when viewed most favorably to plaintiffs, could allow a reasonable jury to infer that Fox had conspired with General Cinema to cut off plaintiffs. The district court, in denying Fox's motion for a judgment notwithstanding the verdict, noted that there was no direct evidence of such a conspiracy, but concluded that there was sufficient indirect evidence to justify a jury inference of conspiracy. We agree with this assessment, as the following analysis of the record will show.

Plaintiffs first experienced problems in obtaining Fox films in early 1975, when two Fox "blockbusters," "Young Frankenstein" and "Towering Inferno," were scheduled for release. Prior to that time, plaintiffs regularly played Fox films, as well as those of other distributors. In late 1974 or January 1975, Lesser attempted to obtain "Young Frankenstein" for exhibition at one of plaintiffs' theatres but was informed by Fox's sales representatives in the Westchester area that the film was being licensed for only one showing in Westchester and that General Cinema's Westchester Mall theatre had already been granted the license. Lesser complained that Fox normally licensed films for more than one run but Fox nonetheless maintained that "Young Frankenstein" would be shown only at General Cinema's Westchester Mall. Subsequently, however, Lesser discovered that the film had also been licensed to another General Cinema theatre in northern Westchester although plaintiffs had not been given an opportunity to bid for this additional run. At trial, Fox failed to offer the testimony of its sales agents that would rebut plaintiffs' version of these events or explain why Fox gave a false explanation for its refusal to honor plaintiffs' request to play "Young Frankenstein."

Plaintiffs confronted similar difficulties in attempting to obtain "Towering Inferno." In January 1975, Lesser unsuccessful-

ly sought a contract to play the film at plaintiffs' Beech Cinema I on the terms requested by Fox in its announcement. When Lesser inquired why his bid had been refused, he was informed by Fox that General Cinema's Central Plaza Theatre had been granted an exclusive twelve-week license to play the film in Westchester County. Lesser argued that he should be permitted to play the film at Beech Cinema I, since it was more than twenty-five miles away from General Cinema's Central Plaza Theatre in Yonkers, and a showing at plaintiffs' theatre would not interfere with the profitability of the Central Plaza exhibition. Lesser was told, however, to address his protest to Fox's New York Branch Manager, William Shields; Lesser sent one such letter, which was not answered. Subsequently, however, Lesser discovered that Fox had again given a false explanation of its refusal to license a film sought by plaintiffs. Specifically, Lesser learned that Fox had licensed "Towering Inferno" to another theatre in Westchester County only seven weeks after the film opened at General Cinema's theatre. Lesser again sent written communications to various Fox officials complaining of his inability to get "Towering Inferno" and suggesting that Fox's conduct might constitute an antitrust violation; Fox apparently did not respond to these complaints.

From that time forward, plaintiffs were unable to procure any first run films from Fox for exhibition in northern Westchester [2] despite Lesser's attempts to rectify the problem. At trial, Fox essentially admitted that it had decided not to deal with plaintiffs but claimed that it reached this decision by itself because of Lesser's refusal to pay a debt of approximately $7,500 owed by Mountain Cinemas, Inc. The evidence, however, showed that Fox did not formally demand payment of the debt until mid-March 1975, several months after plaintiffs' difficulties began, and that Lesser in response did not refuse to assume the Mountain Cinema obligations personally until

**2.** In May 1975, Fox did license "Harry and Tonto," a second-run film, to plaintiff for a one-week period.

late March 1975. Moreover, Fox did not inform plaintiffs until June 1975 that the cut-off was due to Lesser's failure to pay the Mountain Cinemas debt. Plaintiffs also introduced evidence showing that several other theatre chains, including General Cinema, owed Fox substantially greater sums,[3] but were not denied continuing access to Fox films pending payment of these accounts. Also, in cases where an exhibitor was unable to pay the full amount of an outstanding debt, there was evidence that Fox had generally either settled the claim, which Lesser had offered to do, or placed the theatre on a cash collection basis, which Fox never offered to plaintiffs. The above evidence, while not itself establishing a conspiracy, would permit a jury to reject Fox's explanations for its refusal to license films to plaintiffs.

Aside from providing evidence that tended to undermine Fox's explanation of its conduct, the record also contained evidence from which the jury could infer the existence of an unlawful conspiracy between Fox and General Cinema to cut off plaintiffs. First, plaintiffs introduced substantial evidence that, based upon location, attractiveness, size and the ability to attract patrons and attain large box office revenues, their theatres were equal or superior to those of General Cinema. Thus, because the jury was entitled to reject Fox's proffered explanations of its conduct, the jury could also conclude that it would be irrational for Fox to completely refrain from licensing its films to plaintiffs unless it received some hidden benefit from doing so. Moreover, the record indicates that Fox had a history of favoring "circuits"—movie exhibitors with a large number of theatres such as General Cinema—rather than independent movie houses such as plaintiffs, and that Fox had previously entered into various side agreements with such circuits whereby Fox films would be given increased play in return for special concessions.

Additionally, there is evidence in the record from which the jury could infer that Fox attempted to establish such a circuit deal with General Cinema, with the cut-off of plaintiffs being one term of the agreement. Thus, the record indicates that prior to January 1975, General Cinema played relatively few Fox films, and typically entered into informal agreements with plaintiffs and other theatres in the Westchester area to "split" Fox films that were scheduled for release;[4] after Fox ceased licensing films to plaintiffs, however, General Cinema became the largest single exhibitor of Fox films in the New York metropolitan area. Lesser testified that after he was unable to obtain a first run showing of either "Young Frankenstein" or "Towering Inferno," he inquired of a Fox branch executive, Mr. Phil Gravitz, whether Fox had agreed with General Cinema to make General Cinema the exclusive distributor of Fox products in northern Westchester. Gravitz allegedly replied that he could not discuss the matter. There was also evidence at trial that Fox informed Lesser, upon cancelling a contract with plaintiffs to play a second-run engagement of "Young Frankenstein," that Fox would not license films to plaintiffs and that General Cinema was Fox's "kind of customer."

Moreover, there is evidence from which an inference could be drawn that General Cinema "bought into" a special circuit deal with Fox by special payments made in connection with the licensing of "Towering Inferno." Specifically, to obtain the film General Cinema paid an additional $50,000 cash advance to Fox above the $150,000 requested by Fox in its statement of terms issued to exhibitors interested in licensing the film; Fox offered no explanation for this unusually high cash advance. Further-

---

3. For example, the evidence showed that in April 1974, General Cinema owed Fox over one million dollars in film rentals, approximately half of which had been due for over ninety days.

4. A "split" is an arrangement, apparently formerly common in the motion picture industry, under which theatre owners agreed in advance to allocate the pictures available for licensing rather than to compete for the films. The Justice Department has recently disapproved of splits, and most theatres have apparently abandoned the practice.

more, both Fox and General Cinema stood to benefit from an arrangement whereby General Cinema was the exclusive exhibitor of Fox films in northern Westchester. General Cinema provided Fox with significantly expanded distribution of its films in Westchester and throughout the New York area. In return, General Cinema received a monopoly on Fox films in the northern Westchester area, and received much more favorable contract terms than Fox had given plaintiffs with respect to higher house allowances [5] and post-run adjustments of contract terms when the box office receipts of particular films were disappointing.

■ Of course, we are aware that the indirect evidence discussed above is less than overwhelming proof of a conspiracy between General Cinema and Fox to cut off plaintiffs. On this appeal, Fox argues strenuously for an interpretation of the evidence as showing that its refusal to deal with plaintiffs was a unilateral decision based upon Lesser's refusal to pay the $7,500 debt of Mountain Cinemas.[6] Fox's explanation of its cessation of dealings with plaintiffs is not unreasonable and would have persuaded at least one of us, were we sitting as a jury. But we sit as a reviewing court, not as a trier of fact, and we must view the evidence in the light most favorable to the party who persuaded the jury. Fox's version of its dealing with defendants is not necessarily convincing; the explanations it gave to plaintiffs of its refusal to license "Towering Inferno" and "Young Frankenstein" were apparently false, and its justification for the total cut-off of plaintiffs could be regarded by the jury as an after-the-fact excuse. In many respects, Fox failed to confront the evidence against it and the jury might reasonably have inferred from the evidence at trial that Fox and General Cinema reached an understanding that Fox, in order to obtain more business with General Cinema in the New York metropolitan area, would deny Fox pictures to General Cinema's only substantial competitor in northern Westchester County. Accordingly, the district court did not err in denying defendant's motions for a directed verdict and for judgment notwithstanding the verdict.

### III.

■ Appellant also claims that certain evidentiary rulings concerning the issue of damages were erroneous and that, as a consequence, there was no competent evidence introduced by plaintiffs to support the jury's damage award. We have reviewed these arguments carefully, and find that they warrant little discussion. Plaintiffs' theory of damages was based upon the difference between their anticipated earnings on Fox films and the actual amounts earned on films that were played in place of Fox films. As evidence of their actual earnings, plaintiffs introduced various summaries and tabulations of their earnings that were derived from such original business records as cash books. Fox now complains that the original records were not produced. However, summaries based on business records are admissible on the issue of damages. *Regents of the University of Colorado v. K.D.I. Precision Prod., Inc.*, 488 F.2d 261, 268 (10th Cir. 1973), and in any event, Fox could have sought admission of the original cash books if it so desired.

■ Fox also contends that plaintiffs sustained no damages because General Cinema informally gave plaintiffs the exclusive right to bid on United Artists films during the period in which plaintiffs were denied Fox product. Since United Artists films outperformed Fox films during this period, Fox contends that any damages to plaintiffs resulting from the cut-off were entirely mitigated by plaintiffs' exclusive access to United Artists films. Plaintiffs, however, argue that they could have played

---

5. A house allowance is a fixed amount of the receipts from a film showing that is retained by the exhibitor. The distributor generally takes a *percentage of all receipts above the house allowance.*

6. In support of its position, Fox contends, for example, that the dispute over the payment of the $7,500 owed by Mountain Cinemas arose orally in late January or early February 1975, well before the written communications between the parties, that plaintiffs and General Cinema continued to "split" pictures after the alleged conspiracy began, and that Fox had told Lesser that he could resume receiving Fox films as soon as the outstanding Mountain Cinemas debt was paid.

films by both distributors, and hence were damaged by the cut-off. In any event, Fox presented its argument and supporting evidence to the jury, who were instructed by the district court to consider Fox's theory of mitigation. Since the jury awarded plaintiffs approximately a third of their damage claims for specific pictures, the jury may well have made an adjustment in its award for profits plaintiffs received on United Artists films. Accordingly, we reject Fox's argument that as a matter of law plaintiffs sustained no damages.

We have considered all of appellant's arguments and conclude that none requires reversal of the district court. Accordingly, the judgment of the district court is affirmed.