**SUN PUBLISHING COMPANY, INC. et al., Plaintiffs,**

v.

**MECKLENBURG NEWS, INC., et al., Defendants.**

**Civ. A. No. 81–1071–R.**

United States District Court, E.D. Virginia, Richmond Division.

Oct. 11, 1984.

William W. Bennett, Jr., Slayton, Bennett & Rand, South Boston, Va., J. Robert Brame, III, Edward E. Nicholas, III, McGuire, Woods & Battle, Howard Feller, Richmond, Va., and Larry D. Sharpe, Bergson, Borklank, Margolis & Adler, Washington, D.C., for defendants Mecklenburg News, Inc., t/a The News-Progress, a Virginia corp., Keith A. Shelton and Douglas E. Loftis, Jr. and counterclaim defendants.

Daniel A. Carrell, William F. Young, Donald R. Schmidt, Jessine A. Monaghan, Hunton & Williams, Richmond, Va., John H. Shenefield, Peter Halle, Dorothy A. Doherty, Milbank, Tweed, Hadley & McCloy, Washington, D.C., for plaintiff and counterclaim defendant McLaughlin and counterclaim defendant South Boston News, Inc.

James K. Dorsett, Jr., Michael E. Weddington, Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, Raleigh, N.C., Augustus C. Epps, Jr., Christian, Barton, Epps, Brent & Chappell, Richmond, Va., for Park Publications, Inc., Park Broadcasting, Inc. and Roy Park (Non-parties—subpoenae duces tecum).

## MEMORANDUM

MERHIGE, District Judge.

The plaintiffs in this action ("Sun *et al* ") won a jury verdict on their claims that the defendants violated federal antitrust laws in connection with their operation of newspaper publishing businesses in Mecklen-

burg and Halifax Counties, Virginia. Plaintiffs now seek an award of attorneys' fees and costs pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15. An initial petition, filed April 23, 1984, sought fees of $491,894.38 and costs of $23,806.14. A supplemental petition, filed June 1, 1984, seeks an additional $21,815.00 in fees for hours expended subsequent to the filing of the initial petition.

The defendants acknowledge that the plaintiffs are entitled to a fee award, but contend that the amounts requested are excessive in several regards. According to their calculations, an appropriate fee would be in the $60–90,000 range.

The parties have fully briefed and argued the matter and it is now ripe for disposition.

*Background*

This suit was commenced on December 14, 1981, alleging violations of federal and Virginia antitrust laws. Four sets of attorneys participated in representing the plaintiffs at various stages. Their original counsel was John W. Pearsall of McCaul, Grigsby, Pearsall & Davis, a Virginia firm. The case was originally scheduled to go to trial in September of 1982. Just prior to that date, plaintiffs elected to retain new counsel and in the interest of justice a continuance, rarely granted in this District, was obtained. Plaintiffs retained a team of lawyers, from the Washington, D.C. offices of Milbank, Tweed, Hadley & McCloy ("Milbank"), with special expertise and experience in the antitrust field. Pearsall then withdrew from the case, and Hunton & Williams of Richmond, Virginia came in as Milbank's local counsel. A fourth attorney, Donald Blumenthal, Esquire, apparently participated briefly in some capacity just before Milbank and Hunton & Williams were retained.[1]

The Milbank team filed an amended complaint on plaintiffs' behalf on October 18, 1982. At that stage there were three parties-plaintiff, as follows: Sun Publishing Company, Inc., which published a newspaper in Mecklenburg County; South Boston News, Inc., which published one in Halifax County; and Tucker W. McLaughlin, who was and is, in essence, the owner and chief operating officer of the two plaintiff companies. There were seven named defendants at that stage as follows: Mecklenburg News, Inc., which published newspapers in Mecklenburg County; Douglas E. Loftis, Jr., who was the editor and a shareholder in Mecklenburg News; the Halifax Gazette Publishing Co., Inc., which published newspapers primarily in Halifax County; Keith A. Shelton, the president and a shareholder of Halifax Gazette; South Hill Publishing Co., Inc., which published a newspaper in Mecklenburg County; and Harry and Frank Nanney, the president and editor of South Hill Publishing.

At its broadest, plaintiffs' complaint included allegations that the defendants had conspired to restrain trade in violation of Section 1 of the Sherman Act; attempted and/or conspired to monopolize in violation of Section 2 of the Sherman Act; monopolized in violation of Section 2 of the Sherman Act; engaged in corresponding violations of the Virginia Antitrust Act, Va. Code § 59.1–9.1 *et seq.*; and conspired to injure another in his trade or business in violation of Va. Code § 18.2–499. The claims under the Virginia Antitrust Act also included an allegation of unlawful price discrimination. The defendants filed counterclaims making similar allegations against the plaintiffs.

The parties conducted extensive discovery and vigorously and frequently contested numerous motions. Before the case

---

**1.** The Court is unaware of what role Mr. Blumenthal played in this litigation. As discussed in the text, *infra,* neither he nor the plaintiffs have submitted any affidavits attesting to his participation herein, and the Court does not recall his presence at any of the court proceedings. The briefs represent, without substantiation, that he was "briefly retained ... for pur- poses of minimizing the cost of the litigation and aiding the preparation of the case during the early stages of fact investigation." Plaintiffs' Memorandum, April 23, 1984, p. 2. The Court has no reason to doubt the veracity of this unattested assertion, but of course cannot rely on it as evidence in support of the petition.

proceeded to trial in October, 1983, plaintiffs voluntarily dismissed South Hill Publishing Co. and the Nanneys as defendants; dismissed their claims of actual monopolization under Section 2 of the Sherman Act and the Virginia Antitrust Act; and dismissed all of McLaughlin's claims as an individual.

The trial as to all of the remaining issues commenced on October 17, 1983 and continued through October 25, 1983, with the plaintiffs seeking damages of $851,521 for profits the two companies allegedly lost from 1978 to 1982 as a result of defendants' antitrust violations, and the defendants seeking damages in excess of $1.5 million. At the close of plaintiffs' case, the Court directed a verdict for the defendants on the plaintiffs' Virginia price discrimination claim.

The jury returned a special verdict form finding for plaintiffs on each of the remaining claims and against the defendants on each of their counterclaims. The jury found damages of $158,000, to Sun only, as a result of the defendants' conspiracy to divide the market for advertising from a certain major advertiser (Heck's) in violation of Section 1 of the Sherman Act. On all the other counts submitted to them, the jury, though finding liability against the defendants, did not award any monetary damages.

On motion of the defendants, the Court reduced the single damages award to $29,-094.87, finding that any larger amount would be purely speculative. (These damages were of course trebled to $87,284.61 in accordance with the damages provisions of the federal antitrust laws.)

The plaintiffs were given the option of a new trial on damages, but declined it.

## I. *Initial Fee Petition*

### A. *The Request*

The plaintiffs' initial petition seeks a fee award of $491,894.38. That amount is broken down according to the firms involved as follows:

| | Fees |
|---|---|
| Milbank | $338,355.55 |
| Hunton & Williams | 65,690.95 |
| Blumenthal | 9,767.38 |
| Pearsall | 78,080.50 |
| | $491,894.38 |

Two sets of memoranda and affidavits were submitted in support of the fee request. One set, from Milbank, addresses the fees attributed to the services of Milbank, Hunton & Williams, and Blumenthal. The second set is from Pearsall and addresses only the fees attributed to his services.

The Milbank memoranda sets out the process whereby the Milbank, Hunton & Williams, and Blumenthal figures were derived. Briefly, partners at Milbank and Hunton & Williams reviewed their firms' timesheets on the case and deleted from the request all hours that they deemed to be unproductive or duplicative. This step resulted in deletions of over 20% of the hours accumulated. The remaining hours are detailed in affidavits from each firm. They then multiplied the resulting hours by the attorneys' customary billing rates and added them to the total fee generated by Mr. Blumenthal, who is described as having been paid on a weekly basis and as not having kept a record of his hours.

The total generated in this process was then adjusted downward by 35%, in recognition of the fact that plaintiffs' counsel spent considerable time in defending against the counterclaims, for which efforts plaintiffs do not seek a fee award. Because the claims and counterclaims were interwoven and the issues involved often overlapped, the plaintiffs judged it impossible to determine exactly which hours were spent on the affirmative claims and which on the counterclaims. Accordingly, they used 35% as a rough estimate of the percentage of their time that was devoted to the counterclaims, and they have decreased their request accordingly.

The plaintiffs made no other adjustments in arriving at the amount requested as to these three sets of counsel.

The Pearsall memoranda and affidavits set out the hours that his firm spent on the case, as well as his customary rates. The Pearsall request is the product of these two figures.

### B. General Principles Governing Attorneys' Fee Awards

■ The general principles governing the amount of statutory fee awards are well developed in this circuit. District courts are obliged to set out "detailed findings of fact" concerning attorneys' fee awards, in relation to twelve factors.[2] *Barber v. Kimbrell's, Inc.,* 577 F.2d 216, 226, 226 n. 28 (4th Cir.1978). The Court of Appeals for the Fourth Circuit has further specified the appropriate approach to attorneys' fee determinations in *Anderson v. Morris,* 658 F.2d 246 (4th Cir.1981). The basic approach is to multiply the customary hourly rate for the services rendered by the number of hours reasonably expended; the product of these two is the so-called "lodestar" figure. The lodestar is then adjusted on the basis of enumerated other factors, which are the same as the last seven of the twelve factors recognized in *Barber v. Kimbrell's, Inc., supra,* as appropriate considerations in awarding attorneys' fees. *Anderson, supra,* 658 F.2d at 249.

■ The Supreme Court has recently endorsed approaches to attorneys' fee determinations similar to the formulation articulated by the Court of Appeals for the Fourth Circuit in *Anderson. See Blum v. Stenson,* — U.S. —, — — —, 104 S.Ct. 1541, 1544–45, 79 L.Ed.2d 891 (1984); *Hensley v. Eckerhart,* 461 U.S. 424, 432–37, 103 S.Ct. 1933, 1939–41, 76 L.Ed.2d 40 (1983). In addition, the Supreme Court in *Hensley* emphasized the importance of one of the twelve factors cited in *Barber,* the relationship between "results obtained"

and the fee requested. If a plaintiff does not prevail on claims that are "unrelated" to the claims on which the plaintiff succeeded, the district court should not award fees for services rendered on the unsuccessful, unrelated claim. *Hensley, supra,* 461 U.S. at 437, 103 S.Ct. at 1941. Further, the Court must consider whether plaintiff's level of success makes the hours reasonably expended a satisfactory basis for making a fee award. *Id.*

### C. The Lodestar

(i) *Hours Reasonable Expended:* The case at hand may indeed have required fairly extensive preparation. However, it is unfathomable that the entire 7828-plus hours that plaintiffs' attorneys recorded on this case were all reasonably expended in reaching the results ultimately obtained.

■ Probably the most likely source of wasted hours in this case was plaintiffs' midstream change in counsel. It is apparent from the history of the discovery in this action that plaintiffs' new legal team of Milbank and Hunton & Williams discovered the case virtually from scratch, redoing much of the work that Pearsall had previously done and presumably any that Blumenthal may have done as well. Whether this was necessary because the work was considered to have been done inadequately the first time, or was in fact unnecessary, or was simply the unavoidable consequence of a midstream change in counsel is not a question that the Court need resolve, in light of the fact that the fee award goes to the plaintiffs rather than to one or the other of the law firms. The bottom line is that had either the prior or the latter counsel represented the plaintiffs throughout the litigation, numerous hours' worth of duplicated work would have been saved.

**2.** Those twelve often-recited factors are:

(1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by

the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases. 577 F.2d at 226 N. 28.

The plaintiffs are not entitled to a fee award for the duplicative work occasioned by their midstream change of counsel. Accordingly, the Court will award attorneys' fees only for the time that the new counsel—Milbank and Hunton & Williams—expended.

■ An additional reason for denying any award for the hours that Donald Blumenthal spent is that plaintiffs have not provided the Court with any evidence whatsoever of Mr. Blumenthal's participation in the case. The briefs state that he billed on a "weekly basis" for full-time work and that his total bill was $15,026.73. The defendants make much of the fact that no detail is given of how he spent his time. This is an accurate but minor point since no evidence—no affidavit from him, his firm, or the plaintiffs—shows that he indeed spent any time at all or even what his weekly rate is. While detailed records may not be an absolute prerequisite to a fee award, without an affidavit of some sort substantiating the brief's unattested assertion that he indeed played some part in the case, the defendants cannot fairly be required to pay any portion of his fee.

Beyond the deletions of Pearsall's and Blumenthal's hours, the Court is satisfied with Milbank and Hunton & Williams' self-monitoring efforts which resulted in deletions of over 20% of their total hours as unproductive or duplicative. The defendants point to a minor 13.75 hours on matters unrelated to this lawsuit that slipped through and appeared on the timesheets that accompanied the fee petition. Those hours will be deleted, but the Court will not make an additional 10% reduction for duplication and waste, as defendants suggest.

The Court is also satisfied with plaintiffs' proposed allocation of 35% of their time to the non-compensable defense of the counterclaims. The defendants' proposed allocation of 50% seems too high in light of the abundance of similar and overlapping issues between the claims and counterclaims.

(ii) *Customary Hourly Rates:* The hourly rates sought in the fee petition on behalf of the Milbank attorneys are high. The defendants attack them as excessive in light of customary rates in the Richmond legal community. The defendants argue that, while plaintiffs are free to retain expensive, out-of-town counsel, the defendants are not obliged to pay the expensive out-of-town rates.

■ While as a general matter fee requests should be judged by the prevailing rates in the locality where the services are rendered, if a plaintiff acts reasonably in going elsewhere to find an attorney, for instance, because counsel with the requisite specialty and skill are not available locally, then the fee award should be based on the customary fees in the locality where adequate counsel are available. *See Chrapliwy v. Uniroyal, Inc.,* 670 F.2d 760, 768–769 (7th Cir.1982). Additionally, attorneys with specialized skills in a narrow area of the law such as antitrust can be expected to charge more than a general practitioner. *Id.*

■ The Court is satisfied that in the instant case the decision to bring in antitrust specialists from Washington, D.C. as lead counsel for the plaintiffs was not an unreasonable one. The case, although legally straightforward, was factually somewhat complex, and to say the least, plaintiffs had a hard row to hoe to achieve victory. The Court's own observations at the trial suggest that the combined exceptional performance of the Milbank and Hunton & Williams attorneys was crucial to plaintiffs' victory. Few attorneys in the Richmond area have the experience in the field of antitrust laws of that of the attorneys who participated in this case. The combined team performed superbly against an exceptionally well prepared and competent defense team.

Indeed, as illustrative of the difficulty of plaintiffs' position, at one point in settlement negotiations, it was represented to the Court that consideration was being given to plaintiffs paying sums of money to the defendants for a release of the counterclaims. The Court's suggestion, premised on its initial view of the case, that the parties enter into mutual releases without

monetary consideration was rejected by one or both parties.

Plaintiffs' prevailing in this case was directly attributable to the advocacy of their counsel, and there is no doubt that plaintiffs were precariously close to not only losing on their complaint, but being found liable on the counterclaim. It was a jury issue and counsel's performance resulted in a "shoe string catch." It was advocacy at its best.

The defense team also availed itself of the assistance of attorneys from Washington, D.C. who had special expertise in antitrust. This fact supports plaintiffs' assertion that the nature of the case required the skills of out-of-town specialists. *See Chrapliwy v. Uniroyal, Inc.,* 670 F.2d at 768 n. 18.

Accordingly, the Court is prepared to give substantial weight to the customary rate in the District of Columbia for attorneys of the Milbank team's qualifications. On first considering this matter, the Court had assumed that the analysis should stop here, and the Court should simply accept the rates that Milbank quotes as its billing rates for the attorneys involved. Further reflection has led to concern over that result.

Milbank's requested rates are exceptionally high. The lead attorney, John Shenefield, billed at $245 per hour during most of this litigation. Peter Halle, a junior partner who assisted him, billed at $155 per hour during the same period. There is no doubt that these men are exceptionally highly qualified. Mr. Shenefield is a former Assistant Attorney General who was in charge of the Antitrust Division of the Department of Justice. In that capacity he supervised the prosecution of over 250 antitrust cases. Mr. Halle spent eight years in the Antitrust Division, and when he left there in 1981 he was Assistant Chief of the Division's Trial Section. He, too, had extensive trial experience.

In this light, it is conceivable that the Milbank attorneys are able to command the rates they have quoted when they participate in major antitrust litigation between large corporations doing business across the nation or internationally. However, if and when they find time to involve themselves in antitrust litigation between smaller business entities such as those involved in this case, the billing rates quoted may be less a fixed rate than a beginning point for fee negotiations between client and attorney. The average result of such negotiations, rather than the quoted rate, would be Milbank's true "customary" rate for this sort of work. *See generally Blum v. Stenson,* —— U.S. at —— n. 11, 104 S.Ct. at 1547 n. 11; *Chrapliwy v. Uniroyal, Inc.,* 670 F.2d at 767 n. 16.

The defendants have submitted affidavits showing that even the most senior partners at their firm, which is one of the two largest firms here in Richmond, were billing at $150 per hour during the period for which Mr. Shenefield charged $245 per hour. Mr. Halle's billing rates as a Milbank senior associate were $60–65 an hour higher than the comparable rates of senior associates at defendants' firm. Across the board, the quoted billing rates for Milbank's attorneys are more than half again as much as the most nearly comparable Richmond rates. The latter figures are not entirely irrelevant even though the Court has determined to look primarily to District of Columbia rates. The substantial difference between them and the quoted Milbank rates fuels the Court's concern that the Milbank rates may not reflect customary rates for comparable services prevailing even in the District of Columbia.

■ It is the plaintiffs' burden "to produce satisfactory evidence—in addition to the attorneys' own affidavits—that the requested rates are in line with those prevailing in the community for similar services ...." *Blum v. Stenson,* —— U.S. at —— n. 11, 104 S.Ct. at 1547 n. 11. This the plaintiffs have failed to do. Their own attorneys' affidavits aver only that the rates quoted are the rates at which their firm bills their hours; they do not aver that the rates quoted are in line with rates that comparable Washington, D.C. attorneys command for comparable services. Evidence from sources other than plaintiffs' attorneys on rates prevailing in Wash-

ington, D.C. is noticeably absent from plaintiffs' submissions.

 The Court has concluded that Milbank's requested attorney rates are, in this instance, somewhat excessive and that a 15% across-the-board reduction in them would more accurately reflect the applicable customary rate for comparable services. This would yield approximate hourly rates of $200 an hour for Mr. Shenefield and $127.50 an hour for Mr. Halle. These reduced rates are still substantially above the most nearly comparable rates in Richmond, and the Court is satisfied that they would be sufficient to attract adequate legal counsel to a case such as the instant one.

Additionally, the Court has determined that a further downward adjustment in Milbank's rates is in order for several categories of less skilled time.

 First, to pay an attorney the same $200 an hour for travel time as for in-court or other active time would be unreasonable. Ordinarily, travel time should be billed at a substantially lower than usual rate. *Younger v. Glamorgan Pipe & Foundry*

*Co.,* 418 F.Supp. 743, 794 (W.D.Va.1976), *vacated & rem'ded on other grounds,* 561 F.2d 563 (4th Cir.1977); *Steinberg v. Carey,* 470 F.Supp. 471, 479–480 (S.D.N.Y. 1979). The Court has considered the Milbank timesheets, estimated the number of attorney hours spent on travel time, and made a rough calculation of the reduction necessary to reflect a reasonable rate for this less skilled time.[3]

 Second, the Court is satisfied that the rates requested for Milbank's paralegals (up to $42/hour) and a student law clerk ($60/hour) are substantially beyond the rate at which such less skilled services could reasonably be billed in this or any other legal community; these rates also will be reduced to what the Court deems to be a more reasonable level.

The defendants raise no objections to the rates sought for the Hunton & Williams attorneys as plaintiffs' local counsel, and the Court accepts them and the consequent fee request as reasonable.

(iii) *The Lodestar*: The combination of the adjustments discussed *supra* results in a lodestar of $329,236.09 for the fees covered in plaintiffs' initial petition as follows:

$$175 \text{ hrs.} \times (\$120 - \$25)/\text{hr.} = \$16,625.$$

The $16,625 figure will be subtracted from the total of Milbank's attorney charges to reflect the lower rate awarded for travel time.

---

**3.** The Court conservatively estimated that approximately 175 of the Milbank attorney hours in this case were spent travelling. This number was multiplied by the difference between the average hourly rate being awarded generally for the Milbank attorneys—$120/hr.—and what the Court considers to be a reasonable hourly rate for travel time—$25/hr.—as follows:

| 1. Milbank Request | Total Hours Billed | Hourly Rate Awarded |
|---|---|---|
| Shenefield | 468.75 | $ 200.00 |
| Halle | 1,158.00 | 127.50 |
| Doherty | 967.00 | 110.00 |
| Kayne | 198.00 | 85.00 |
| Gesner (associate) | 467.25 | 72.25 |

| | |
|---|---|
| Total Attorney Charges: | $398,353.81 |
| —less reduced rates for atty. travel time (see fn. 3, *supra*) | – 16,625.00 |
| —less amount billed for 13.75 unrelated hours | – 1,568.50 |
| | $380,160.31 |
| —Plus law clerk/paralegal charges: Gesner—363.75 hrs. at awarded rate of $25/hr. | + 9,093.75 |
| Garrison—648 hrs. at awarded rate of $25/hr. | +16,200.00 |
| | $405,454.06 |
| Discount for counterclaim work: $405,454.06 x 65% = | $263,545.14 |
| 2. Hunton & Williams Request | +65,690.95 |
| 3. Lodestar | $329,236.09 |

## D. Adjustments to the Lodestar

The plaintiffs have not sought any upward adjustment in the lodestar. The defendants seek a downward adjustment of 15% because of the limited results obtained in comparison to the amount in controversy. They also seek an additional reduction on the ground that fee awards in similar cases have generally been substantially lower than the lodestar here. The Court additionally has invited inquiry on whether the relative financial positions of the litigants might be a third basis for an adjustment to the lodestar. These three factors will be considered in turn.

 As the defendants point out, the monetary damages ultimately awarded in this lawsuit were meager in comparison to the amounts sought. The plaintiffs' expert and other damage evidence failed to convince the jury that the plaintiffs suffered damages other than those that Sun suffered in 1981/1982 as the result of defendants' collusion in regards to the Heck's advertising account. As to those damages, the plaintiffs failed to produce sufficient evidence to sustain a jury verdict in any amount greater than the $29,094.87 value of that account itself. As the Court previously has ruled, the evidence was not sufficient to sustain additional damages sought on this count on the theory that the loss of the Heck's account caused further tangible damage through a "shopping center effect." It must be borne in mind that plaintiffs could well have suffered a million plus dollars award against them had they not prevailed on the counterclaims. Those claims were neither frivolous nor unsubstantial.

Additionally, the plaintiffs suffered a directed verdict on their claim of price discrimination in violation of Virginia antitrust laws. This claim was sufficiently factually inter-related with the plaintiffs' other claims that work performed on it may have contributed somewhat to the plaintiffs' victory on the other claims, as the plaintiffs have argued. However, there were also distinct factual elements to this claim, and had it not been pursued, dis-

covery would probably have been substantially briefer.

The defendants suggest that plaintiffs' voluntary pre-trial dismissal of the South Hill Publishing defendants, of the actual monopolization court, and of McLaughlin's individual claims further justify a reduction for unsuccessful claims. These claims, however, were factually highly interrelated with the successful claims. Only the claims against the South Hill Publishing defendants might appear at first glance to be distinct; as to them, evidence of their participation as co-conspirators with the remaining defendants was successfully adduced at trial in support of the conspiracy counts against the remaining defendants. Hence, efforts directed at obtaining evidence against them were ultimately related to the successful claims. Accordingly, the Court will not give weight to the voluntary dismissal of these counts in fixing the fee award.

The plaintiffs argue that this lawsuit obtained results beyond the monetary damages awarded. The Court agrees: The signals sent to the defendants via the jury's finding of liability on all counts should prevent any future attempts to eliminate plaintiffs' newspapers from the Mecklenburg and Halifax Counties' markets. This result serves both the public and private interests that the antitrust laws were designed to protect.

However, the Court simply cannot ignore the lost price discrimination count and the vast discrepancy between the amount of damages sought and obtained. Even assuming that the non-monetary results are substantial, the defendants' proposed 15% reduction of the lodestar on this factor seems conservative and fair, and the Court will adopt it. The fee award for the services covered in the initial petition will accordingly be reduced to $279,850.68, which is 85% of the lodestar.

The defendants argue that another of the *Barber* factors—attorneys' fees awards in similar cases—justifies a further reduction in the fee award here. In support of this argument, they attach charts purporting to summarize fee awards in

similar antitrust cases, and from their charts they derive a rule of thumb that antitrust fee awards should not be more than 2 to 3 times the single damage award in the case.

In response, the plaintiffs cite two examples of antitrust fee awards that were more than fourteen times the single damage award. *Greenhaw v. Lubbock County Beverage Ass'n.*, 721 F.2d 1019 (5th Cir. 1983) (fee award of $246,517; damages of $17,482); *Copper Liquor, Inc. v. Adolph Coors Co.*, 684 F.2d 1087 (5th Cir.1982) (fee award of $244,687.50; single damages of $15,000). Defendants' own list reveals at least one case in which the fee was as much as 43 times the single damage award, *Osborn v. Sinclair Refining Co.*, 207 F.Supp. 856, 864 (D.Md.1962) (fee award of $14,000; single damages of $325), and another case in which a nominal single damage award of $6 did not preclude the court from awarding fees of $54,079. *Knutson v. Daily Review, Inc.*, 479 F.Supp. 1263 (N.D.Cal.1979).

These cases may be the exception rather than the rule, yet they demonstrate the inappropriateness of trying to establish a fixed relationship between the fee award and the monetary results obtained. The relatively high ratio in the instant cases and the others just mentioned between the fee award sought and the single damage award says more about the difficulty of establishing damages in such cases than it says about how much it should reasonably cost to try an antitrust case. The Court has already determined to cut the fee award in this case by 15% because of the relatively meager monetary results. A further reduction on this ground but under the guise of "fee awards in similar cases," would be inappropriate.

The size of fee awards in similar antitrust cases are perhaps more informative as a guide to the range of absolute amounts required to try an antitrust case, and the lesson the range teaches is that such cases are often expensive to try. Awards in the hundreds of thousands of dollars, such as the one sought here, are not unusual. *See*, in addition to cases cited

*supra, International Travel Arrangers, Inc. v. Western Airlines, Inc.,* 623 F.2d 1255 (8th Cir.1980) (fee award of $161,004); *Wall Products Co. v. National Gypsum Co.,* 367 F.Supp. 972 (N.D.Cal.1973) ($625,-000).

Accordingly, the Court is satisfied that fees in similar cases do not compel an adjustment of the fees in this case.

■ The final factor to which the Court has given consideration as a basis for adjusting the lodestar is the relative financial positions of the litigants. The Fourth Circuit Court of Appeals has stated that in appropriate circumstances this factor may merit some weight in determining the size of the fee award. *Arnold v. Burger King Corp.,* 719 F.2d 63, 68 (4th Cir.1983).

In light of defendants' suggestions in their briefs and at oral argument that a large fee award would result in the financial ruin and elimination of defendants' newspapers, the Court solicited information on this ground. If the fee award in this case were to drive the defendants' newspapers out of business, Halifax and Mecklenburg Counties would return to being "one-newspaper-towns," a result that would be entirely inconsistent with the purposes of the antitrust laws and their attorneys' fees provisions.

■ Accordingly, the Court stood prepared to make a substantial adjustment to the lodestar to prevent this result, if the figures supported defendants' suggestions. Although the Court gave them ample opportunity, the defendants have failed to supply the Court any information whatsoever on their financial positions. Absent such information, the Court has determined that no further adjustment to the lodestar

would be appropriate in this case. The Court has considered the *Barber* factors not expressly addressed herein and has determined that they merit no discussion and compel no adjustments to the lodestar.

## II. *Supplemental Petition*

The plaintiffs submitted a supplemental petition seeking an additional $21,815 for time that Milbank and Hunton & Williams spent preparing and defending the initial fee petition. The defendants did not file any opposition to the supplemental petition.

■ Despite some adjustments, the plaintiffs have substantially prevailed in their prosecution of the fee petition, and the cost of so doing is properly taxable as part of the attorneys' fee award. *Spray-Rite Services Corp. v. Monsanto Corp.,* 684 F.2d 1226, 1250 (7th Cir.1982), *aff'd on other grounds* — U.S. ——, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984).

The discussion *supra* regarding the reasonableness of Milbank's requested rates for attorney time is fully applicable to the supplemental petition. Accordingly, the supplemental award will reflect the same 15% reduction in those requested rates as was applied to the initial petition. No additional rate reduction for less skilled time will be made here because the supplemental petition contains minimal travel time and no paralegal or law clerk time.

The Court accepts the hours requested in the supplemental petition as reasonable. Although the volume of work appears high for a simple fee petition, the amount of money involved was probably sufficient to justify the time spent.

Accordingly, the lodestar for the supplemental petition can be computed as follows:

| 1. Milbank Request | Hours Billed | Hourly Rate Awarded |
|---|---|---|
| Shenefield | 29.50 | $ 200.00 |
| Halle | 23.75 | 127.50 |
| Gesner | 103.25 | 72.25 |
| | TOTAL | $16,387.94 |
| 2. Hunton & Williams Request | | +2,130.00 |
| 3. Lodestar | | $18,517.94 |

The Court has considered the factors enumerated in *Barber* and elsewhere and has determined that no adjustment is necessary to this lodestar figure. Accordingly, the plaintiffs will be awarded $18,517.94 for the services covered in the supplemental petition.

## III. *Costs*

The plaintiffs seek taxation of the costs that their various counsel incurred in pursuit of this action. The costs requests are detailed in the attorneys' affidavits and are in summary as follows:

| | Costs |
|---|---|
| Milbank | $16,603.98 |
| Hunton & Williams | 4,522.51 |
| Pearsall | 2,679.65 |
| | $23,806.14 |

The defendants agree that plaintiffs are entitled to their costs pursuant to Fed.R. Civ.P. 54(d) and 28 U.S.C. § 1920. They dispute the amounts requested on several grounds.

Defendants argue that most of the items included in Pearsall's bill of costs are not properly taxable. The Court agrees. Costs may ordinarily be awarded only for the expenses enumerated in the statute, as follows:

1. fees of the clerk and marshal;
2. fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case;
3. fees and disbursements for printing and witnesses;
4. fees for exemplification and copies of papers necessarily obtained for use in the case; ....

28 U.S.C. § 1920.

■ Costs such as travel expenses, delivery service, secretarial overtime, long-distance phone calls, postage, meals, etc., while properly billable to a client, are not properly taxed as costs by the Court. *See Beech Cinema Inc. v. Twentieth Century Fox Film Corp.*, 480 F.Supp. 1195, 1198 (S.D.N.Y.1979), *aff'd on other grounds*, 622 F.2d 1106 (2nd Cir.1980). Additionally, photocopy charges are properly taxable only to the extent that the copies were used as court exhibits or were furnished to the court or opposing counsel. *Id.*

Accordingly, the Court will deny all of the costs itemized in Pearsall's affidavit with the exception of the service and filing fees totalling $146.62 and appropriate photocopy charges. Pearsall should submit a revised bill of costs, detailing the allowable portion of his $723.54 photocopy charges, to the Clerk of the Court for taxation in the usual manner.

The defendants challenge the costs of fourteen of the deposition transcripts included in Milbank and Hunton & Williams' bills of cost on the grounds that those depositions were not introduced at trial, used for cross-examination, used in trial motions, nor used in pre trial conferences. The plaintiffs do not challenge this assertion, but they argue that the depositions were nonetheless relevant to the development of their case and hence taxable.

■ The general rule is that "depositions taken solely for discovery are not taxable as costs." *Marcoin, Inc. v. Edwin K. Williams & Co., Inc.*, 88 F.R.D. 588 (E.D.Va.1980); *Sperry Rand Corp. v. A-T-O, Inc.*, 58 F.R.D. 132, 137 (E.D.Va. 1973). Only "if the depositions were actually introduced in evidence or used at trial for impeachment purposes" is it "proper to conclude that they were necessarily obtained for use in the case" and hence are properly taxable. *Id.*

The Court sees no reason to depart from this rule here. The costs of the 14 depositions listed in defendants' memoranda will not be taxed to the defendants. Plaintiffs will be required to account for the costs of these depositions separately and to deduct this amount from the cost award.

■ The defendants challenge the costs of an additional nine deposition transcripts on the grounds that these depositions related primarily to defendants' counterclaims. The defendants overlook the fact that the plaintiffs—as counterclaim defendants— prevailed on the counterclaims as well as on their affirmative claims. Accordingly,

the costs of these depositions are properly taxable.

 Finally, the defendants argue that plaintiffs' cost award should be offset to the extent of $7,500. Defendants incurred unnecessary expenses in that amount, they argue, solely because plaintiffs' substituted counsel re-deposed four people whom plaintiffs' first counsel had already deposed. Defendants made a motion to that effect on December 20, 1982, in which they detailed the expenses included.

The Court is satisfied that defendants incurred the $7,500 expenses solely as a result of plaintiffs' mid-stream change of counsel and consequently that the plaintiffs should bear the expense. The cost award to plaintiffs will be offset accordingly.

### Summary

The plaintiffs will, in summary, be awarded attorneys' fees of $279,850.68 on the initial petition and $18,517.94 on the supplemental petition, for a total of $298,-368.62. If the parties cannot agree on the appropriate amount of costs in accordance with this memorandum, the Clerk of the Court will resolve any remaining disputes in the usual manner.

An appropriate order will issue.

### ORDER

For the reasons stated in the accompanying memorandum, and deeming it just and proper so to do, the Court ORDERS that judgment be and the same is hereby entered for the plaintiff Sun Publishing Co., Inc. in the amount of $298,368.62 as and for attorneys' fees, plus post-judgment interest on $279,850.68 thereof at the rate of 9.98% per annum from October 25, 1983 until paid, and plus post-judgment interest on the remaining $18,517.94 thereof at the current legal rate of 11.36% per annum from the present until paid. The plaintiff is directed to submit a revised bill of costs to the Clerk of the Court in accordance with the accompanying memorandum. This action stands dismissed.

Let the Clerk send copies of this order and the accompanying memorandum to all counsel of record.