[No. A037916. First Dist., Div. One. Apr. 22, 1988.]

REDWOOD THEATRES, INC., Plaintiff and Appellant, v.
FESTIVAL ENTERPRISES, INC., et al., Defendants and
Respondents.

690

COUNSEL

Joseph L. Alioto and Lawrence Alioto for Plaintiff and Appellant.

M. Laurence Popofsky, Judith Z. Gold, Jessica S. Pers, Jeffrey A. Leon, Heller, Ehrman, White & McAuliffe Frederick S. Fields, Carlyn Clause and Bronson, Bronson & McKinnon for Defendants and Respondents.

OPINION

NEWSOM, J.—Redwood Theatres, Inc. (hereafter appellant) filed this action on February 28, 1985, against a competing motion picture exhibitor, Festival Enterprises, and four major film distributors, Paramount Pictures Corporation, Warner Bros. Distributing Corporation, Orion Pictures Corporation, and Twentieth Century Fox Film Corporation (hereafter respondents). The complaint seeks treble damages for antitrust violations under the Cartwright Act and, alternatively, damages for fraud. The action against Twentieth Century Fox Film Corporation was later voluntarily dismissed. Much of the record on appeal consists of extensive arguments on a discovery request: appellant's motion to compel production of the distributor defendants' "cutoff cards"—records providing a history of film rentals in each market—for six cities in Northern California where Festival Enterprises does business. After the initial trial date was continued, respondents successfully moved for summary judgment, which was entered on January 15, 1987.

The case presents simple facts and complex questions of law. Appellant operates the Briggsmore Seven Theatre in Modesto, California. In 1981 and 1982, it invested $1.7 million for renovation and conversion of the theatre into a seven-screen complex. Two other exhibitors, including the respondent Festival Enterprises, also operate theatres in Modesto. Festival Enterprises operates additional theatres in five other Northern California markets—Hayward, Stockton, Fresno, Walnut Creek, and Marin County—and in Alaska and Southern California.

From our perusal of the record, we learn that the major film distributors in the United States release films simultaneously in hundreds of markets under license agreements. Almost all of a film's revenues in a market comes from its "first run"; box office receipts tend to diminish with each week that a picture is played. Distributors will license a first-run film to only one theatre in a medium-sized market such as Modesto. Commonly, the films are licensed by competitive bidding; the distributors send out written bid

invitations and evaluate the bids submitted for each market. In other cases, the distributors may contact competing exhibitors by telephone to negotiate licensing terms.

Appellant's complaint alleges that the distributor defendants "have entered into unwritten agreements with Festival [Enterprises] pursuant to which all or substantially all of the Paramount, Warner Bros. and Orion first run product is licensed to the Festival-owned theatre or theatres in Modesto, Hayward, Stockton, Fresno, and to a lesser extent, Walnut Creek-Pleasant Hill, and in Marin County, . . ." Although the distributors have continued to solicit bids for Modesto showings, appellant alleges that the bids have been a sham; the distributors are committed to Festival Enterprises even before bid invitations go out. As a result, the distributors have repeatedly licensed potentially remunerative films to Festival Enterprises even though appellant has submitted demonstrably superior bids.

The alleged unwritten agreements vary somewhat among the distributor defendants. For example, Warner Bros. is said to have committed only about 80 percent of its films to Festival Enterprises during the period December 1978 to August 1982; thereafter, it licensed films more evenly among Modesto exhibitors but reserved the most financially attractive films for Festival Enterprises. There is no allegation that the distributor defendants conspired among themselves or that they were a party to a plan to drive the appellant out of business. Rather, the agreements are alleged to be part of a business policy in which the distributor defendants dealt preferentially with theatre circuits such as Festival Enterprises.

In affidavits opposing the motion for summary judgment, appellant offers to prove the alleged agreement largely through the history of bidding. Though possessing superior facilities, it has been unable to obtain the desired first-run films even though it has frequently outbid its competitor, Festival Enterprises. Appellant also points to certain admissions of distributor's representatives which tend to some extent to corroborate this circumstantial evidence. But the history of bidding still may reflect only the distributors' disinclination to do business with appellant. To complete its case, appellant needed to show that it did not lose out in the bidding because of some factor peculiar to itself but because the distributors dealt preferentially or exclusively with Festival Enterprises throughout its circuit. This evidence arguably might be provided by the distributor's cut-off cards which list the films licensed to each theatre in each market and record the essential terms of the license agreement, box office receipts, and rental payments. The denial of its discovery motion left it without this critical evidence.

Although the agreement allegedly deprived it of access to substantially all the defendant distributors' films, appellant bases its claim for damages on bidding for twenty specific films—eight from Paramount, seven from Warner Bros., and five from Orion. In each case, it offers to prove that it submitted a bid superior to that of Festival but failed to secure the film and was forced to license a less popular motion picture. Festival earned a gross profit on the twenty films of $628,157; during the same time period, appellant made a gross profit of only $268,269 on less desirable films.

In brief, while the evidence produced in discovery is rather equivocal, appellant maintains that the requested cutoff cards would clearly establish the alleged agreements between Festival Enterprises and the three distributor defendants. The alleged agreements, which are independent of each other and seem lacking in any predatory intent, reflect the distributors' preference for dealing with theatre circuits to the exclusion of independents such as appellant. The question on appeal is whether such exclusive-dealing agreements are violative of the state antitrust laws.

■ Although the complaint states a cause of action under the California Cartwright Act, (Bus. & Prof. Code, § 16720 et seq.) the briefs in this appeal have relied almost exclusively on federal precedents under the Sherman Act (15 U.S.C. § 1). "A long line of California cases has concluded that the Cartwright Act is patterned after the Sherman Act and both statutes have their roots in the common law. Consequently, federal cases interpreting the Sherman Act are applicable to problems arising under the Cartwright Act." (*Marin County Bd. of Realtors, Inc.* v. *Palsson* (1976) 16 Cal.3d 920, 925 [130 Cal.Rptr. 1, 549 P.2d 833]; *G.H.I.I.* v. *MTS, Inc.* (1983) 147 Cal.App.3d 256, 265 [195 Cal.Rptr. 211, 41 A.L.R.4th 653].) Since the relevant case law under the Cartwright Act is comparatively sparse, we will also rely chiefly on federal decisions.

■ The federal precedent of most immediate relevance to this case, *United States* v. *Paramount Pictures* (1948) 334 U.S. 131 [92 L.Ed. 1260, 68 S.Ct. 915], was forged in over a decade of litigation. It has been called "the greatest economic victory ever achieved by the Department of Justice" (*Southway Theatres, Inc.* v. *Georgia Theatre Co.* (5th Cir. 1982) 672 F.2d 485, 497) and resulted in a fundamental restructuring of the industry. In a dissenting opinion, Justice Frankfurter observed, "[t]he terms of the decree in this litigation amount, in effect, to the formulation of a regime for the future conduct of the movie industry." (*Id.* 334 U.S. at p. at 179 [92 L.Ed. at p. 1304].)

The Paramount Pictures case reached the Supreme Court with two companion cases which concerned regional chains of motion picture exhibitors

and dealt chiefly with charges of abuse of monopoly power. (*United States v. Griffith,* (1948) 334 U.S. 100 [92 L.Ed. 1236, 68 S.Ct. 941]; *Schine Theatres* v. *United States* (1948) 334 U.S. 110 [92 L.Ed. 1245, 68 S.Ct. 947].) In the most significant of these cases, *United States* v. *Griffith,* the Department of Justice brought suit against 4 affiliated motion picture exhibitors which operated a circuit of theatres in 85 towns in the southwestern United States; in 53 of these towns there were no competing theatres. The exhibitors jointly negotiated licensing agreements that "lumped together towns in which the [exhibitors] had no competition and towns in which there were competing theatres." (*Id.* at pp. 102-103 [92 L.Ed. at p. 1241].) The Supreme Court held that the agreements served to monopolize trade in violation of sections 1 and 2 of the Sherman Act. (*Id.* at p. 106 [92 L.Ed. at p. 1243].) The opinion reasoned that an exhibitor with a monopoly of theatres in part of a circuit may not use "that strategic position to acquire exclusive privileges in a city where he has competitors, . . ." (*Id.* at p. 107 [92 L.Ed. at p. 1243].)

In *United States* v. *Paramount Pictures, supra,* 334 U.S. 131, the Department of Justice directed its attack against the major motion picture distributors in the country. The complaint sought to enjoin a long list of anticompetitive practices, each of which was discussed *ad seriatim* by the Supreme Court and a distinguished three-judge panel in the lower court. We may approach the decision by first discussing its analysis of the two practices involved in this appeal—circuit dealing and franchising—and then considering the significance of the decision in light of the subsequent evolution of the antitrust law.

The Department of Justice sought to enjoin two forms of circuit dealing—formula deals and master agreements. A formula deal was a licensing agreement with a circuit of theatres in which the license fee of a given feature was measured "by a specified percentage of the feature's national gross." A master agreement covered exhibition in several theatres in a particular circuit and allowed "the exhibitor to allocate the film rental paid among the theatres as it sees fit and to exhibit the features upon such playing time as it deems best, . . ." (*Id.* at pp. 153-154 [92 L.Ed. at pp. 1290-1291].)

Affirming the finding of the district court that formula deals and master agreements unreasonably restrain competition, the Supreme Court noted that under the holdings of *United States* v. *Griffith, supra,* 334 U.S. 100 "the pooling of the purchasing power of an entire circuit in bidding for films is a misuse of monopoly power insofar as it combines the theatres in closed towns with competitive situations." (*Id.* at pp. 154-155 [92 L.Ed. at p.

1291].) But the court also affirmed the district court finding for a reason distinct from the misuse of monopoly power: the practices deprived other theatre owners of the opportunity to bid for motion pictures in their several areas. (*United States* v. *Paramount Pictures* (S.D.N.Y. 1946) 66 F.Supp. 323, 347.) Under this holding, "circuit dealing" violated section 1 of the Sherman Act even where all of the markets within a circuit were competitive. Referring to formula deals and master agreements, the court explained, "they eliminate the possibility of bidding for films theatre by theatre. In that way they eliminate the opportunity for the small competitor to obtain the choice first runs, and put a premium on the size of the circuit. They are, therefore, devices for stifling competition and diverting the cream of the business to the large operators." (*United States* v. *Paramount Pictures, supra,* 334 U.S. at p. 154 [92 L.Ed. at p. 1291].)

The court's consideration of franchising agreements required remand of the case to the district court for further findings. As a remedy for noncompetitive practices, the district court had ordered a system of competitive bidding; franchising agreements were obviously incompatible with this scheme and were specifically enjoined. (*United States* v. *Paramount Pictures, supra,* 66 F.Supp. 323, 347; *United States* v. *Paramount Pictures* (S.D.N.Y. 1946) 70 F.Supp. 53, 63.) After rejecting the remedy of competitive bidding in favor of divestment, the Supreme Court directed the district court to reconsider whether the practice of franchising was in fact an unreasonable restraint of trade. The opinion observed, "[f]ranchise agreements may have been employed as devices to discriminate against some independents in favor of others. . . . But we cannot say on this record that franchises are illegal *per se* . . . ." (*United States* v. *Paramount Pictures, supra,* 334 U.S. at p. 156 [92 L.Ed. at p. 1292].) On remand, the district court enjoined the defendants from granting franchises to affiliated exhibitors but held that they might give them to independent theatre operators under appropriate circumstances. "We hold . . . that any of the defendants may grant franchises *to* an independent operator, provided that the result thereof will be to enable such independent to compete effectively with theatres affiliated with a defendant or with theatres in the new theatre circuits to be formed pursuant to our order of divorcement." (*United States* v. *Paramount Pictures* (S.D.N.Y. 1949) 85 F.Supp. 881, 897.) The Supreme Court affirmed *per curiam*. (*Loew's, Inc.* v. *United States* (1950) 339 U.S. 974 [94 L.Ed. 1380, 70 S.Ct. 1031]; *Twentieth Century Fox Film Corp.* v. *United States* (1950) 339 U.S. 974 [94 L.Ed. 1380, 70 S.Ct. 1032]; *Warner Bros. Pictures, Inc.* v. *United States* (1950) 339 U.S. 974 [94 L.Ed. 1380, 70 S.Ct. 1032].)

In the present case, the issue of abuse of monopoly power is no longer raised. While asserting that defendant Festival Enterprises possesses a

monopoly in one of the six areas in Northern California where it does business, the complaint alleges that it used this monopoly position only in bargaining with a dismissed defendant—Twentieth Century Fox Film Corporation. But the *Paramount Pictures* decision still prohibits circuit dealing as an unreasonable restraint of trade under section 1 of the Sherman Act and subjects franchises to careful antitrust scrutiny. The text of the opinion, in fact, suggests that circuit dealing is a per se violation of the Sherman Act; it holds categorically that the practice is an unreasonable restraint of trade while making clear that certain other practices are *not* per se illegal, e.g., clearances and franchises. (*United States* v. *Paramount Pictures, supra,* 334 U.S. at pp. 145, 156 [92 L.Ed. at pp. 1286, 1291-1292].) The final decree in the case enjoined the defendants "[f]rom making or further performing any formula deal or master agreement to which it is a party." (*U.S.* v. *Paramount Pictures, Inc. et al. 1949 Trade Cases* ¶ 62,377; *U.S.* v. *Loew's, Inc., et al. 1951 Trade Cases* ¶ 62,765.)

The *Paramount Pictures* decision, however, must be understood in light of its peculiar facts and context. Formerly, the distributors controlled circuits of theatres, and commonly attempted to lessen competition at the exhibitor level by using their vertical leverage through such devices as block booking, direct discrimination against independent exhibitors, joint operation of theatres, and conspiracy to fix prices and establish uniform clearances. The charge of circuit dealing was colored by this evidence of conspiracy and vertical leverage; not only were some of the circuits controlled by affiliates, but in many instances there was "cooperation among the major defendants in their respective capacities as distributors and exhibitors." (*United States* v. *Paramount Pictures, supra,* 85 F.Supp. 881, 888.) As the district court observed, the holding that circuit dealing was an unreasonable restraint of trade should be considered "in view of the history and relation to the moving picture business of the various parties to this action . . . ." (*United States* v. *Paramount Pictures, supra,* 66 F.Supp. 323, 346.) Similarly, franchising had been a device used by the major distributors for domination of the exhibition business. The ultimate decision to prohibit franchises except to independent exhibitors represented an effort to unravel the effects of the distributors' past domination of film exhibition.

The *Paramount Pictures* decision "radically altered the structure of the industry," by requiring the major distributors to divest themselves of existing theatre circuits and by placing stringent restrictions on future acquisitions. (*U.S.* v. *Paramount Pictures, Inc.* (S.D.N.Y. 1980) *1980-2 Trade Cases* ¶ 63,553, p. 76,951.) Today, the issues surrounding circuit dealing have acquired a very different industrial context. As the court commented in *Southway Theatres, Inc.* v. *Georgia Theatre Co., supra,* 672 F.2d 485, 498,

"[w]ith the elimination of a motion picture industry vertically integrated downward to the exhibitor level, the significance of a distributor's refusal to do business with an independent shifts dramatically." Moreover, it now makes no sense to distinguish between circuit dealing and franchising; both are exclusive dealing agreements. Circuit dealing defines the territorial extent of exclusive dealing in terms of a theatre circuit; franchising defines the duration of the agreement in terms of a period of years. In either case, the antitrust issues may be defined in terms of exclusive dealing agreements.

Although it remains the leading decision in the field, *Paramount Pictures* must be construed in a manner consistent with the subsequent evolution of the antitrust law. In the 30 years of antitrust litigation following the *Paramount Pictures* decision, independent film exhibitors have frequently challenged theatre chains and major distributors on a variety of grounds. ■ A line of cases has proceeded on a theory alleging that a competing exhibitor and major film distributors have conspired among themselves "to deprive independent operators of desirable runs or priorities of exhibition of films, . . ." (*Loew's, Inc.* v. *Cinema Amusements* (10th Cir. 1954) 210 F.2d 86, 89, cert.den. (1954) 347 U.S. 976.) The theory falls within the conventional definition of a group boycott. The decisions have never questioned that a conspiracy among distributors and an exhibitor "depriving plaintiff of an opportunity to obtain the supply of first-run films needed for effective competition . . ." constitutes a violation of the Sherman Act. (*Brown* v. *Western Massachusetts Theatres, Inc.* (1st Cir. 1961) 288 F.2d 302, 304.) Rather, the critical issue on appeal has centered on proof of conspiracy by circumstantial evidence. In some cases, a summary judgment or directed verdict has been affirmed. (*Universal Amusements Co.* v. *Gen. Cinema Corp.* (S.D.Tex. 1985) 635 F.Supp. 1505; *Columbia Pictures Industries, Inc.* v. *Moyer* (D.C.Or. 1981) *1981-1 Trade Cases* ¶ 63,878; *Lamb's Patio Theatre* v. *Universal Film Exchanges* (7th Cir. 1978) 582 F.2d 1068 [47 A.L.R.Fed. 200]; *Viking Theatre Corp.* v. *Paramount Film Distributing Corp.* (3d Cir. 1963) 320 F.2d 285, affd. (1964) 378 U.S. 123 [12 L.Ed.2d 743, 84 S.Ct. 1657].) But the plaintiffs have won a share of the cases by successfully proving collusion among distributors and competing exhibitors to deprive them of remunerative first-run films. (*Beech Cinema* v. *Twentieth Century Fox Film* (2d Cir. 1980) 622 F.2d 1106; *Columbia Pictures Corp.* v. *Charles Rubenstein, Inc.* (8th Cir. 1961) 289 F.2d 418; *Fox West Coast Theatres Corp.* v. *Paradise T. Bldg. Corp.* (9th Cir. 1958) 264 F.2d 602; *Paramount Film Distributing Corp.* v. *Village Theatre, Inc. 1955 Trade Cases* ¶ 68,239; *Bordonaro Bros. Theatres* v. *Paramount Pictures* (2d Cir. 1949) 176 F.2d 594.)

Very few decisions have alluded to the specific practices of circuit dealing and franchising disapproved in *Paramount Pictures*. (But see *Paramount*

*Film Distributing Corp.* v. *Applebaum* (5th Cir. 1954) 217 F.2d 101, 122, cert. den. (1955) 349 U.S. 961.) In two recent cases, however, the issue of circuit dealing has arisen in connection with alleged conspiracies to cut off the plaintiff from desired first-run films. (*Schmidt* v. *Columbia Pictures Industries Inc.* (D.C.Nev. 1982) *1986-2 Trade Cases* ¶ 67, 323; *Beech Cinema* v. *Twentieth Century Fox Film, supra,* 622 F.2d 1106.) In this context, circuit dealing may be viewed not as a per se violation of the Sherman Act (as suggested by the language of Paramount Pictures), but as a tactical device that has been used—and may be used again—in illegal conspiracies to exclude motion picture exhibitors from trade relations needed to compete. Franchising stands on the same ground. But while the practices may merit scrutiny, the issue of a Sherman Act violation will turn on the general antitrust law concerning boycotts.

In a long line of decisions the Supreme Court has held categorically that agreements to exclude competitors from valued trade relations are unreasonable restraints of trade. (*Montague & Co.* v. *Lowry* (1904) 193 U.S. 38 [48 L.Ed. 608, 24 S.Ct. 307]; *Fashion Guild* v. *Trade Comm'n.* (1941) 312 U.S. 457 [85 L.Ed. 949, 61 S.Ct. 703]; *Silver* v. *New York Stock Exchange* (1963) 373 U.S. 341 [10 L.Ed.2d 389, 83 S.Ct. 1246].) Since *Northern Pac. R. Co.* v. *United States* (1958) 356 U.S. 1, 5 [2 L.Ed.2d 545, 549-560, 78 S.Ct. 514], the court has identified such group boycotts as per se violations of the Sherman Act. (See also *United States* v. *General Motors* (1966) 384 U.S. 127, 145 [16 L.Ed.2d 415, 426, 86 S.Ct. 1321]; *Marin County Bd. of Realtors, Inc.* v. *Palsson, supra,* 16 Cal.3d 920, 931-935.)[1] Among these boycott decisions, *Klor's* v. *Broadway-Hale Stores* (1959) 359 U.S. 207 [3 L.Ed.2d 741, 79 S.Ct. 705], bears closest resemblance to the present case. The alleged boycott also consisted of agreements between a single competing dealer and its suppliers. The plaintiff, Klor's, operated a retail store specializing in household appliances in San Francisco located next door to a major department store owned by Broadway-Hale Stores. In its complaint, Klor's alleged that Broadway-Hale and 10 suppliers conspired among themselves either not to sell it household appliances or to sell them at commercially unacceptable terms. The district court granted summary judgment for

---

[1] The per se rule, however, has been subject to some semantic confusion. The term "boycott" is sometimes used interchangeably with "concerted refusal to deal," which plainly cannot always be held in violation of the Sherman Act. (*Rothery Storage & Van Co.* v. *Atlas Van Lines, Inc.* (D.C.Cir. 1986) 792 F.2d 210, 215 [253 App.D.C. 142], cert. den. (1987) 479 U.S. 1033 [93 L.Ed.2d 834, 107 S.Ct. 880].) In *Northwest Stationers* v. *Pacific Stationery* (1985) 472 U.S. 284 [86 L.Ed.2d 202, 105 S.Ct. 2613], the court undertook to clarify the area of per se illegality: "Cases to which this Court has applied the per se approach have generally involved joint efforts by a firm or firms to disadvantage competitors by 'either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle.'" (*Id.* at p. 294 [86 L.Ed.2d at p. 211].)

the defendants on the ground that the alleged conspiracy did not affect market conditions. It relied on affidavits showing that there was an active local market in household appliances, involving hundreds of other retailers who sold many competing brands of appliances. Reversing the judgment, the Supreme Court held that the plaintiff had alleged a group boycott that belonged to the "classes of restraints which from their 'nature or character' were unduly restrictive." (*Klor's* v. *Broadway-Hale Stores, supra,* 359 U.S. at p. 211 [3 L.Ed.2d at p. 744].) The plaintiff therefore did need not to allege market-wide injury to competition.

■ The present case, however, differs from *Klor's* in a critical respect. There, the complaint alleged a conspiracy *among* the suppliers of the competing retailer. Here, the complaint contains no allegation of a combination among the distributor defendants; rather it alleges three separate agreements between the competing exhibitor and three major film distributors. If the plaintiff had alleged collusion among the offending film distributors, the case would come within the holding of *Klor's.* In the absence of this allegation, we must consider whether the three alleged agreements between the competing exhibitor and the distributor defendants may individually constitute a boycott.

In his frequently cited text, Sullivan comments that "the concept of a boycott does not necessarily involve the concert of several traders." If a single firm succeeds in inducing one important supplier to cease dealing with a would-be competitor, the resulting accommodation "would display all the essential elements of a boycott." (Sullivan, The Law of Antitrust (1977) p. 231, fn. 1.) The case law indeed includes a few examples of such a two-party boycott involving a single competing dealer and a single supplier. (See *Murphy Tugboat Co.* v. *Crowley* (9th Cir. 1981) 658 F.2d 1256, cert. den. (1982) 455 U.S. 1018 [72 L.Ed.2d 135, 102 S.Ct. 1713].) In *Six Twenty-Nine Productions, Inc.* v. *Rollins Telecasting, Inc.* (5th Cir. 1966) 365 F.2d 478, the plaintiff, one of three advertising agencies in Pensacola, Florida, charged that the only television station in the vicinity refused to accept its services because of a conspiracy between the station and a competing advertising agency. Under these facts, the court found a violation of section 1 of the Sherman Act. Again, in *Cherokee Laboratories, Inc.* v. *Rotary Drilling Services, Inc.* (5th Cir. 1967) 383 F.2d 97, cert. den. (1968) 390 U.S. 904 [19 L.Ed.2d 870, 88 S.Ct. 816], plaintiff complained of an agreement between Monsanto and a competing dealer. Plaintiff's principal business dealt with a highly specialized commodity in a very limited market—additives for drilling muds. After selling a specialized additive to plaintiff for many years, Monsanto gave exclusive distributorship rights to a competing dealer who then raised the price to the plaintiff. Stressing the apparent lack of an

available substitute for the additive, the court held that the jury could have found that the exclusive distributorship effectively priced the plaintiff out of the market. "Such conduct would constitute a per se violation of Section 1." (*Id.* at p. 105.)

But as *Cherokee Laboratories* suggests, an alleged two-party boycott is likely to be equivalent to an exclusive distributorship—a business arrangement not often subject to antitrust challenges. (See *Kolling* v. *Dow Jones & Co.* (1982) 137 Cal.App.3d 709, 719 [187 Cal.Rptr. 797]; *Milton* v. *Hudson Sales Corp.* (1957) 152 Cal.App.2d 418 [313 P.2d 936]; *Rolley, Inc.* v. *Merle Norman Cosmetics* (1954) 129 Cal.App.2d 844 [278 P.2d 63].) In *Klor's,* the court made clear that it did not intend to cast doubt on the legality of such agreements: "This is not a case of a single trader refusing to deal with another, nor even of a manufacturer and a dealer agreeing to an exclusive distributorship. Alleged in this complaint is a wide combination consisting of manufacturers, distributors and a retailer." (*Klor's* v. *Broadway-Hale Stores, supra,* 359 U.S. 207, 212-213 [3 L.Ed.2d 741, 745], fn. deleted; quoted in *People* v. *Santa Clara Valley Bowling etc. Assn.* (1965) 238 Cal.App.2d 225, 235 [47 Cal.Rptr. 570].) In *Continental T.V., Inc.* v. *GTE Sylvania Inc.* (1977) 433 U.S. 36, 55 [53 L.Ed.2d 568, 583, 97 S.Ct. 2549], the court noted that exclusive distributorships may stimulate competition by inducing dealers to accept new products, to invest in service or repair facilities, or to engage in costly promotional activities.

All exclusive distributorship agreements involve an intent to deprive competitors of access to a supplier; this is the *raison d'etre* of the agreement—the incentive offered to the dealer to make investment and promotional expenses. Cases such as *Six Twenty-Nine Productions* and *Cherokee Laboratories,* in which an exclusive dealing agreement constitutes a boycott, are probably rare and confined to unusual market conditions. Still, the possibility cannot be excluded a priori. Appellant heavily relies on a recent Second Circuit decision that appears to apply such a two-party boycott theory to the motion picture industry.

In *Beech Cinema* v. *Twentieth Century Fox Film, supra,* 622 F.2d 1106, four affiliated independent theatre operators brought suit against a single major distributor, Twentieth Century Fox Film Corporation (Fox), and a single competing exhibitor, General Cinema Corporation (General Cinema). Beginning about January 1975, Fox ceased to license films to the plaintiffs but continued actively to deal with General Cinema. Plaintiffs secured a favorable jury verdict on the theory that General Cinema had conspired with Fox "to cut off" their access to Fox films. The court found evidence "that Fox had a history of favoring 'circuits' . . . . [¶] . . . that

Fox attempted to establish such a circuit deal with General Cinema, with the cut-off of plaintiffs being one term of the agreement . . . [and] [¶] . . . that General Cinema 'bought into' a special circuit deal with Fox by special payments made in connection with the licensing of 'Towering Inferno.' " (*Id.* at p. 1109.) Largely on the strength of this evidence, the court held that there was sufficient evidence "of a conspiracy between General Cinema and Fox to cut off plaintiffs." (*Id.* at p. 1110.)

The opinion's repeated use of the phrase "to cut off plaintiffs" suggests that *Beech Cinema* should be accepted for the proposition that a plan to deprive a competitor of needed trade relations, which satisfies the requirements of a conspiracy, constitutes a boycott even if a single exhibitor and a single distributor are involved. (Cf. *Southway Theatres, Inc.* v. *Georgia Theatre Co., supra,* 672 F.2d 485, 500.) But the case is difficult to justify on its facts; the court emphasized that the offending agreement was for the mutual economic benefit of the defendants—a factor that would seem to imply a legitimate business purpose rather than predatory intent. ■■ ■■ The decision does not attempt to distinguish the alleged conspiracy from the sort of exclusive dealing agreement sanctioned in *Klor's*.[2] On somewhat similar facts, *Columbia Pictures Industries, Inc.* v. *Moyer* (D.C.Or. 1981) *1981-1 Trade Cases* ¶ 63,878, rejected a boycott theory. (*Id.* at p. 75,554.) The result, moreover, is difficult to reconcile with a later Second Circuit decision, *Oreck Corp.* v. *Whirlpool Corp.* (2d Cir. 1978) 579 F.2d 126, cert. den. (1978) 439 U.S. 946 [58 L.Ed.2d 338, 99 S.Ct. 340], which also involved an alleged conspiracy between a single distributor and a single supplier.

■■ In the case at bar, an inference of a boycott is no doubt facilitated by market factors common to the industry—the unique character of films and the highly consolidated market structure—and by the existence of more than one alleged exclusive dealing agreement between Festival Enterprises and major distributors. These factors make it easier to infer that an

---

[2] The oft-repeated rule that film distributors have freedom to choose where their films will play stands as a formidable obstacle to any attempt to characterize an exclusive dealing agreement as a boycott conspiracy. It has always been the prerogative of a supplier to decide with whom it will deal. (*G.H.I.I.* v. *MTS, Inc. supra,* 147 Cal.App.3d 256, 267-268.) Thus, " '[A] distributor has the right to license or refuse to license his film to any exhibitor, pursuant to his own reasoning, so long as he acts independently. . . .' " (*Lamb's Patio Theatre* v. *Universal Film Exchanges, supra,* 582 F.2d 1068, 1070; *Admiral Theatre Corp.* v. *Douglas Theatre Co.* (8th Cir. 1978) 585 F.2d 877, 888; *Paramount Film Distributing Corp.* v. *Applebaum, supra,* 217 F.2d 101, 124.) "A distributor acting independently has no legal duty to offer equally suitable theaters an equal opportunity to negotiate for or obtain films. [Citation.] Nor must it assess bids consistently or in good faith." (*Universal Amusements Co.* v. *Gen. Cinema Corp., supra,* 635 F.Supp. 1505, 1514-1515.) It may favor a particular exhibitor "for any reason or no reason at all." (*Id.* at p. 1515.)

exclusive dealing agreement serves to drive a competitor out of business. But appellant has produced no evidence of predatory intent. Neither has it shown that the alleged agreements were dictated by the exhibitor, concerned with its own position, rather than granted in the exercise of the distributors' independent discretion. (See *United States* v. *Chicago Tribune-New York News Syn., Inc.* (S.D.N.Y. 1970) 309 F.Supp. 1301, 1307; *G.H.I.I.* v. *MTS, Inc., supra,* 147 Cal.App.3d 256, 268.) The evidence actually suggests that the alleged agreements reflect the perceived business advantages to the distributors of dealing with large theatre circuits. This showing plainly falls short of the evidentiary threshold required to sustain a boycott theory of per se liability.

The facts may be viewed, however, not as a boycott but as a vertical restraint, suggesting a quite different analysis. Respondents have insisted that this is the proper conceptual framework for the case. Under *Continental T.V., Inc.* v. *GTE Sylvania Inc., supra,* 433 U.S. 36, such vertical restraints are subject to a rule-of-reason analysis to determine their impact on competition.[3] This approach indeed is most consistent with the Supreme Court's analysis in the *Paramount Pictures* decision. The court there was concerned with a market dominated by a few major distributors. The practices of circuit dealing and franchising were enjoined because of their link with the anticompetitive market structure in the motion picture industry.

The terms "boycott" and "vertical restraint" are in fact merely labels that call for different forms of antitrust analysis—one focusing on competitive practices, the other on broader questions of market structure. We regard the two approaches as being potentially complementary; an anticompetitive practice may be linked to anticompetitive market conditions. The question whether a specific practice offends the Sherman Act ought not to exclude a broader inquiry into market structure.

While *Continental T.V., Inc.* v. *GTE Sylvania Inc., supra,* 433 U.S. 36, held definitively that the rule of reason applies to vertical restraints on territory and customers, it did not discuss the application of the rule. A suggestive footnote indicated only that the rule of reason required a "balancing [of] intrabrand and interbrand competitive effects of vertical

---

[3] This conceptual issue is mirrored in the majority and dissenting opinions in *Oreck Corp.* v. *Whirlpool Corp., supra,* 579 F.2d 126. When Whirlpool Corp. terminated its vacuum cleaner distributorship, Oreck Corp. brought suit alleging that Whirlpool had acted at the behest of another distributor, Sears Roebuck & Co. The dissent insisted that the case should be analyzed as a boycott involving a per se violation of the Sherman Act. (*Id.* at p. 138.) The majority maintained that "[t]he present case, involving as it does an alleged agreement between a single manufacturer and a single dealer, is, in essence, an exclusive distributorship controversy, and the 'group boycott' doctrine, is, therefore, not applicable." (*Id.* at p. 131)

restrictions . . . ." (*Id.* at p. 57, fn. 27 [53 L.Ed.2d at p. 584].) But as observed in *Valley Liquors, Inc.* v. *Renfield Importers, Ltd.* (7th Cir. 1982) 678 F.2d 742, 745, "[a]dmittedly, this test of illegality is easier to state than to apply, the effects to be weighed being so difficult to measure or even estimate by the methods of litigation. The courts have therefore looked for shortcuts. A popular one is to say that the balance tips in the defendant's favor if the plaintiff fails to show that the defendant has significant market power (that is, power to raise price significantly above the competitive level without losing all of one's business)."

Since the *Sylvania* decision, several other federal courts applying the rule of reason to vertical restraints have required this threshold inquiry into the defendant's market power. (E.g., *Rothery Storage & Van Co.* v. *Atlas Van Lines, Inc., supra,* 792 F.2d 210; *Graphic Products Distributors* v. *Itek Corp.* (11th Cir. 1983) 717 F.2d 1560; *Muenster Butane, Inc.* v. *Stewart Co.* (5th Cir. 1981) 651 F.2d 292; *Ralph C. Wilson Indus.* v. *American Broadcasting* (N.D.Cal. 1984) 598 F.Supp. 694, affd. (9th Cir. 1986) 794 F.2d 1359.) As a practical matter, market power is usually equated with market share. "Since market power can rarely be measured directly by the methods of litigation, it is normally inferred from possession of a substantial percentage of the sales in a market carefully defined in terms of both product and geography." (*Valley Liquors, Inc.* v. *Renfield Importers, Ltd., supra,* 678 F.2d 742, 745; see also *Valley Liquors, Inc.* v. *Renfield Importers, Ltd.* (7th Cir. 1987) 822 F.2d 656, 666-667.) A similar preliminary test of market power has emerged in the area of tying arrangements. (Cf. *People* v. *National Association of Realtors* (1981) 120 Cal.App.3d 459, 468 [174 Cal.Rptr. 728, 22 A.L.R.4th 79].) In *Jefferson Parish Hospital Dist. No. 2* v. *Hyde* (1984) 466 U.S. 2 [80 L.Ed.2d 2, 104 S.Ct. 1551], the Supreme Court proscribed tying only when market power "is used to impair competition on the merits in another market" so that a potentially inferior product is insulated from competitive pressures. (*Id.* at p. 14 [80 L.Ed. at p. 14].) The Department of Justice's Vertical Restraints Guidelines, published January 23, 1985, now employ very precise "market structure screen" tests, relying on market shares, to determine whether vertical restraints on territory or customers and tying arrangements should be subject to antitrust scrutiny. (5 Trade Reg. Rep. (CCH) ¶ 50,473.)

Respondent urges us to adopt this approach to the case at bar. If we do so, it will lead directly to affirmance of the summary judgment. Based on ticket sales, the distributor defendants' average market shares for the five-year period at issue were only 16 percent (Warner), 15 percent (Paramount) and 3 percent (Orion). These market shares fail conspicuously to pass the threshold test establishing the defendant's market power. In the absence of

any allegation or evidence of collusion among the distributors, the market shares cannot be aggregated to determine the defendants' collective market power. Therefore, respondents argue, there is no need to enter into any further analysis of the competitive impact of the alleged exclusive dealing agreements.

Appellant offers to prove, however, that profitable operations in the theatre business depend on the limited supply of a unique product—popular first-run films. According to its expert witness, "[a] good picture will do business in a tent. The bad picture won't do good, won't do business in a top theatre." In a typical Modesto theatre, the record shows, a good film may gross as much as $25,000 in its first week; a poor picture as little as $1,000. Hence, if an exhibitor fails to license the rights to show "Raiders of the Lost Ark," it will avail him nothing to negotiate favorable terms for "Amazon Quest"—a film that has eluded public attention. "Raiders of the Lost Ark" will pack the theatre; "Amazon Quest" will not cover operating expenses. Appellant's film buyer declares, "[t]he name of the game in the theatre business is to keep the doors open until one gets a successful picture. . . . To survive, a theatre simply must get the good pictures."[4]

In antitrust law, the interchangeability of products is usually considered in the definition of markets; the boundary of a relevant market is defined by a significant degree of product differentiation. But there will always be some degree of product differentiation within a market—and as the motion picture industry demonstrated—very significant product differentiation can occasionally be found within a well-defined market. In *U.S.* v. *Arnold, Schwinn & Co.* (1967) 388 U.S. 365, 381 [18 L.Ed.2d 1249, 1261, 87 S.Ct. 1856], the Supreme Court regarded "the presence of adequate sources of alternative products" as a "critical" factor in evaluating the competitive effects of vertical restraints. Holding that consignment sales subject to territorial resale restrictions were not unreasonable restraint of trade, the court relied on the fact "that other competitive bicycles are available to distributors and retailers in the marketplace, and there is no showing that they are

---

[4] In *United States* v. *Columbia Pictures Industries, Inc.* (S.D.N.Y. 1980) 507 F.Supp. 412, 431, the court accepted a similar argument with respect to the exhibition of films in the pay television industry: "While it is undoubtedly true, as the defendants argue, that the rare, outstanding film can be shown many times (even after it has appeared on commercial television) and will still draw a substantial market, the evidence is overwhelming that 'golden oldies' are not the essential element of pay television; it is the new, never-before-shown-on-television, motion picture that the subscriber pays his money for. The other new pictures of nondefendant movie producers, which would be available equally to Premiere and the rest of the market, are not sufficient to allow equality among competitors." Since "golden oldies" seldom play in commercial theatres, the importance of popular, first-run films may be greater in the theatre exhibition business.

not in all respects reasonably interchangeable . . . with the Schwinn product . . . ." (*Id.* at p. 381 [18 L.Ed.2d at p. 1261]; fn. deleted.)[5] Where alternative products are not available, an exclusive franchise agreement may merit antitrust scrutiny.[6] Thus, in *United States* v. *Chicago Tribune-New York News Syn. Inc., supra,* 309 F.Supp. 1301, 1307, the government challenged exclusive territorial franchises for newspaper features, such as comics and crossword puzzles. Denying a motion to dismiss, the court explained, "[t]he government may be able to show at trial that there are no products available in the market which are 'equivalent' to the features of Tribune." We have earlier mentioned *Cherokee Laboratories, Inc.* v. *Rotary Drilling Services, Inc., supra,* 383 F.2d 97, in connection with boycotts. But in ruling that the jury could find an exclusive franchise agreement in violation of the Sherman Act, the court also drew from cases in the field of vertical restraints. In the court's view, the critical consideration was that "it was open to the jury to infer that competitive products were *not* 'readily available' to others." (*Id.* at p. 105; see also *Southway Theatres, Inc.* v. *Georgia Theatre Co., supra,* 672 F.2d 485, 500, fn. i; *Ass'n of Independent T.V.* v. *College Football Ass'n* (W.D.Okla. 1986) 637 F.Supp. 1289, 1299 [note relevance of product differentiation].)

In his concurring opinion in *Continental T.V. Inc.* v. *GTE Sylvania Inc., supra,* 433 U.S. 36, 64 [53 L.Ed.2d 568, 589], Justice White observed that economists use the criteria both of market share and product differentiation to measure market power. Product differentiation most commonly leads indirectly to a finding of market power by contracting the size of the relevant market, but it has been taken directly into account in the analysis of vertical restraints (*Graphic Products Distributors* v. *Itek Corp., supra,* 717 F.2d 1560, 1570-1571) and tying. (*Metrix Warehouse, Inc.* v. *Daimler-Benz Aktiengesellschaft* (D.C.Md.) *1982-2 Trade Cases* ¶ 64,861; *Colorado Pump & Supply Co.* v. *Febco, Inc.* (10th Cir. 1973) 472 F.2d 637, 640, cert. den. (1973) 411 U.S. 987 [36 L.Ed.2d 965, 93 S.Ct. 2274].) By reducing the substitutability of products, a high level of product differentiation results in relative inelasticity of cross-product demand. This inelasticity creates opportunities for suppliers to manipulate the price and quantity of goods sold

[5] In evaluating vertical restraints, Schwinn applied the rule of reason only to consignment sales, holding that restraints on territories and customers were illegal per se where title passed to the retailer. The decision was reversed in *Continental T.V., Inc.* v. *GTE Sylvania Inc., supra,* 433 U.S. 36 with respect to its rule of per se illegality, but it remains valid authority for application of the rule of reason. The availability of commercially equivalent products continues to be a relevant factor in analyzing vertical restraints in post-Sylvania cases. (See *Donald B. Rice Tire* v. *Michelin Tire Corp.* (1980) 483 F.Supp. 750, 760.)

[6] Cf. *Lorain Journal* v. *United States* (1951) 342 U.S. 143, 152 [96 L.Ed. 162, 72 S.Ct. 181] (the fact that buyers cannot compete without seller's product regarded as relevant circumstance in finding violation of section 2 of the Sherman Act).

or to entrench their market position by creating barriers to entry in a market.[7]

 The unusual competitive conditions of the theatre business, marked by the presence of a unique product in short supply, put an entirely different complexion on the issue of market power. Exclusive dealing agreements involving a dominant firm in an industry have long been subject to antitrust scrutiny.[8] But where competitive survival depends on gaining access to a unique product, these agreements may present serious antitrust questions in any well-consolidated industry even if it is dominated by no single firm. This is the situation of the motion picture industry where six major companies distribute the bulk of the most remunerative first-run films. The antitrust concerns may be illustrated by an analogy to a card game. Playing cards, like popular first-run motion pictures, are not substitutable; a given card and no other will complete a winning sequence. Imagine a series of contract bridge tournaments in which the king of spades and queen of hearts—one-eighth of the face cards—are consistently removed from the hand of one player and replaced by a numbered card. Although the player may win some hands, he is sure to place low in the competitive standings, tournament after tournament, no matter how skillfully he plays.[9]

This example suggests that if a motion picture exhibitor lacks access to a substantial share of popular first-run films, he may be placed at a grave competitive disadvantage against a competitor who has locked-in access to these films through exclusive dealing agreements. The alleged agreements with Warner Bros. and Paramount Pictures plainly present this issue. During the 3-year period of 1983 through 1985, Warner Bros. and Paramount Pictures distributed no less than 31 of the 60 pictures placing among the top 20 box office hits in each year. As usual in business, failure may beget

---

[7] See *R.C. Dick Geothermal Corp.* v. *Thermogenics, Inc.* (N.D.Cal. 1985) 619 F.Supp. 441, 455, appeal pending, Ninth Circuit. (The court recognized the relevance of product differentiation to ease of entry in a market. By extension, product differentiation may facilitate the creation of barriers to entry.)

[8] See Sullivan, The Law of Antitrust, *op. cit. supra,* section 149, page 429 [exclusive franchises] and 3 Areeda and Turner, Antitrust Law: An Analysis of Antitrust Principles and their Application (1980), section 732, page 253 [requirements contracts]. Most cases involving such exclusive dealing agreements are decided under the Clayton Act section 3, (*Standard Co.* v. *Magrane-Houston Co.* (1921) 258 U.S. 346 [66 L.Ed. 653, 42 S.Ct. 360]; *Standard Oil Co.* v. *United States* (1949) 337 U.S. 293 [93 L.Ed. 1371, 69 S.Ct. 1051]; *Tampa Electric Co.* v. *Nashville Coal Co.* (1961) 365 U.S. 320 [5 L.Ed.2d 580, 81 S.Ct. 623]) but the Sherman Act contains parallel restrictions. (2 Areeda & Turner, Antitrust Law: An Analysis of Antitrust Principles and their Application, *op cit. supra,* § 304, p. 6; *Interface Group, Inc.* v. *Mass. Port Authority* (1st Cir. 1987) 816 F.2d 9, 11; *Graphic Products Distributors* v. *Itek Corp., supra,* 717 F.2d 1560.)

[9] The example is, of course, purely heuristic. We do not mean to suggest that there is any precise mathematical analogy.

failure. By getting an inferior share of major films, the theatre may experience difficulties in making prompt rental payments, resulting in strained relationships with distributors, or it may secure fewer regular customers so that, when it does show a major film, it attracts smaller crowds than it otherwise would. The record on the appellant's motion for summary judgment, of course, does not allow us to assess these suppositions; they may be accurate or inaccurate. We can only say that the hypothesis is implicit in appellant's offer of proof.

If this hypothesis is correct, the presence of exclusive dealing agreements between theatre circuits and major distributors may entrench the position of established motion picture exhibitors and pose formidable barriers to entrepreneurs seeking to enter (or expand operations) in the theatre business. The new entrant into the business by definition will lack comparable exclusive dealing agreements and will not easily achieve the bargaining power to negotiate them. An entrepreneur, such as appellant, seeking to enlarge a small foothold in the industry will, of course, face the same difficulties. Both the legislative history and subsequent interpretation of the Sherman Act reveal that it was intended to prohibit unreasonable restraints on the freedom of entrepreneurs to enter new markets or to expand a small market share.

 "As a charter of freedom, the [Sherman] Act has a generality and adaptability comparable to that found to be desirable in constitutional provisions." (*Appalachian Coals, Inc.* v. *U. S.* (1933) 288 U.S. 344, 359-360 [77 L.Ed. 825, 829, 53 S.Ct. 471]; see also *Northern Pac. R. Co.* v. *United States, supra,* 356 U.S. 1, 4 [2 L.Ed.2d 545, 549]; *People* v. *Santa Clara Valley Bowling etc. Assn., supra,* 238 Cal.App.2d 225, 233.) Within American political traditions, monopoly has long been perceived as a threat to individual liberties. Jefferson had proposed that a prohibition against monopoly be included in the Bill of Rights. The rapid spread of the trust device in the 1880's merely rekindled old fears of corporate power as a threat to freedoms. (Letwin, Law and Economic Policy in America: the Evolution of the Sherman Antitrust Act (1965) pp. 53-99.) Striking the dominant theme in the congressional debates, Senator Sherman declaimed, "[T]hen, making this extorted wealth the means of further extortion from their unfortunate victims, the people of the United States, they pursue unmolested, unrestrained by law, their ceaseless round of peculation under the law, till they are fast producing that condition in our people in which the great mass of them are the servitors of those who have this aggregated wealth at their command." (21 Cong. Rec. 2461 (1890); see also pp. 2457, 2469.)[10]

---

[10] This central purpose of assuring freedom of opportunity in the face of accumulations of corporate wealth, now obscured by changing social concerns, was readily apparent to

The policy of assuring access to markets thus is central to the legislative purpose of the Sherman Act. Professors Blake and Jones write, "[n]ot only are we interested in material well-being and distrustful of political power, but we also have a strong libertarian streak. In the absence of strong countervailing considerations, we favor freedom of action and the wide range of choice that freedom implies. The competitive system dovetails well with this sentiment . . . in providing maximum freedom of opportunity for consumers and for present and prospective businessmen as well . . . . [T]he individual who wants to be an entrepreneur rather than an employee ought not to have his opportunities restricted by unnecessary barriers to entry or by trade practice designed specifically to eliminate him from the field." (Blake & Jones, *In Defense of Antitrust* (1979) 65 Colum. L.Rev. 377, 383-384.)[11] Indeed, as the Supreme Court noted in *United States* v. *du Pont & Co.* (1956) 351 U.S. 377, 390 [100 L.Ed. 1264, 1278, 76 S.Ct. 994], one prominent sponsor of the Act, Senator Hoar, defined monopoly, not in terms of the power to influence the price or quantity of goods sold, but as the power to deny competitors a just and equal opportunity to compete. Monopoly, he asserted, " 'involved something like the use of means which made it impossible for other persons to engage in fair competition.' " (*Ibid.* fn. deleted; 21 Cong. Rec. 3151 (1890).)

contemporaries. In one of the earliest and most authoritative interpretations of the Sherman Act, *Standard Oil Co.* v. *United States* (1911) 221 U.S. 1, 50 [55 L.Ed. 619, 641, 31 S.Ct. 502], the Supreme Court explained, "[t]he debates . . . conclusively show . . . that the main cause which led to the legislation was the thought that it was required by the economic condition of the times; that is, the vast accumulation of wealth in the hands of corporations and individuals, the enormous development of corporate organization, the facility for combination which such organizations afforded, the fact that the facility was being used, and that combinations known as trusts were being multiplied, and the widespread impression that their power had been and would be exerted to oppress individuals and injure the public generally." Again , in *Ramsay Co.* v. *Bill Posters Assn.* (1923) 260 U.S. 501, 512 [67 L.Ed. 368, 370, 43 S.Ct. 167], the court stated that "[t]he fundamental purpose of the Sherman Act was to secure equality of opportunity and to protect the public against evils commonly incident to destruction of competition through monopolies and combinations in restraint of trade."

[11] The debate over the purposes of the antitrust laws has generally acknowledged a balance of economic, social, and political goals. Particularly distinguished contributions include: *The Goals of Antitrust: A Dialogue on Policy* (1965) 65 Colum.L.Rev. 363; Flynn, *Antitrust Jurisprudence: A Symposium on the Economic, Political and Social Goals of Antitrust Policy* (1977) 125 U.Pa.L.Rev. 1182; Letwin, *Congress and the Sherman Antitrust Law: 1887-1890* (1956) 23 U.Chi.L.Rev. 221; Bohling, *Franchise Terminations under the Sherman Act: Populism and Relational Power* (1975) 53 Tex.L.Rev. 1180, 1189-1193; Fox, *The Modernization of Antitrust: a New Equilibrium* (1981) 66 Cornell L.Rev. 1140; Lande, *Wealth Transfers as the Original and Primary Concern of Antitrust: The Efficiency Interpretation Challenged* (1983) 34 Hastings L.J. 65; Rowe, *The Decline of Antitrust and the Delusions of Models: the Faustian Pact of Law and Economics* (1984) 72 Georgetown L.J. 1511. But in recent decades a distinct school of thought has vigorously espoused economic efficiency as the only goal of antitrust. See Bork, The Antitrust Paradox: a Policy at War With Itself (1975); Posner, Antitrust Law: An Economic Perspective (1976).

The protection of the entrepreneur's right to compete is an especially prominent theme in the antitrust law respecting boycotts. (See *Paramount Famous Corp.* v. *U.S.* (1930) 282 U.S. 30, 43 [75 L.Ed. 145, 150-151, 51 S.Ct. 42]; *Fashion Guild* v. *Trade Comm'n, supra,* 312 U.S. 457, 465 [85 L.Ed. 949, 953]; *United States* v. *General Motors, supra,* 384 U.S. 127, 140 [16 L.Ed.2d 415, 423-424].) In *Associated Press* v. *United States* (1945) 326 U.S. 1 [89 L.Ed. 2013, 65 S.Ct. 1416], the Supreme Court considered a bylaw of a cooperative news gathering association that prohibited "all AP members from selling news to non-members, and which granted each member powers to block its non-member competitors from membership." (*Id.* at p. 4 [89 L.Ed. 2013, 2021-2022].) Ruling that the bylaws violated the Sherman Act, it found, "[t]he net effect is seriously to limit the opportunity of any new paper to enter these cities. Trade restraints of this character, aimed at the destruction of competition, tend to block the initiative which brings newcomers into a field of business and to frustrate the free enterprise system which it was the purpose of the Sherman Act to protect." (*Id.* at pp. 13-14, fn. deleted [89 L.Ed. at p. 2027].) Again, in *Silver* v. *New York Stock Exchange, supra,* 373 U.S. 341, the court found that a stock exchange procedure that effectively denied the plaintiff an opportunity to enter the securities business constituted a group boycott, falling outside the protection of the Securities Exchange Act (15 U.S.C. § 78 et seq.). Finally, in *Klor's* v. *Broadway-Hale Stores, supra,* 359 U.S. 207, as we have seen, the court held that a conspiracy to drive out of business a single small businessman violated the act. "[I]t is not to be tolerated merely because the victim is just one merchant whose business is so small that his destruction makes little difference to the economy. Monopoly can as surely thrive by the elimination of such small businessmen, one at a time, as it can by driving them out in large groups." (*Id.* at p. 213 [3 L.Ed.2d at p. 745], quoted in *People* v. *Santa Clara Valley Bowling etc. Assn., supra,* 238 Cal.App.2d 225, 233.)

In terms of economic theory, significant barriers to entry "are the *sine qua non* of monopoly and oligopoly. . . ." (Scherer, Industrial Market Structure and Economic Performance, (1980) p. 10) These barriers are objectionable on social as well as economic grounds. As explained in *Berkey Photo, Inc.* v. *Eastman Kodak Co.* (2d Cir. 1979) 603 F.2d 263, 273 [53 A.L.R.Fed. 768], cert. den. (1980) 444 U.S. 1093 [62 L.Ed.2d 783, 100 S.Ct. 1061], "[c]onsiderations of political and social policy form a major part of our aversion to monopolies, for concentration of power in the hands of a few obstructs opportunities for the rest." In *Brown Shoe Co.* v. *United States* (1962) 370 U.S. 294, 316, footnote 28 [8 L.Ed.2d 510, 530-531, 82 S.Ct. 1502], the Supreme Court quoted from the opinion of Justice Learned Hand in *United States* v. *Aluminum Co. of America* (2d Cir. 1945) 148 F.2d 416,

429: " 'Throughout the history of these [antitrust] statutes it has been constantly assumed that one of their purposes was to perpetuate and preserve, for its own sake and in spite of possible cost, an organization of industry in small units which can effectively compete with each other.' " (See also *id.* at pp. 427-428; *Brown Shoe Co.* v. *United States, supra,* 370 U.S. at p. 344 [8 L.Ed.2d at p. 547].) Similarly, decisions concerning monopolies based on ownership of essential facilities, such as wholesale produce markets, have condemned policies that restrict the freedom of entrepreneurs to enter or expand their operations in affected markets. (*Bale* v. *Glasgow Tobacco Board of Trade, Incorporated* (6th Cir. 1964) 339 F.2d 281, 286-287.) Invalidating a lease restriction in a produce market, one court observed, "[t]he [Sherman] Act does not merely guarantee the right to create markets; it also insures the right of entry to old ones." (*Gamco, Inc.* v. *Providence Fruit & Produce Bldg.* (1st Cir. 1952) 194 F.2d 484, 487.)

Safeguarding the entrepreneur's freedom to challenge established competitors has been a central concern in the field of vertical mergers. In *Brown Shoe Co.* v. *United States, supra,* 370 U.S. 294, 323-324 [8 L.Ed.2d 510, 535], the Supreme Court declared, "[t]he primary vice of a vertical merger or other arrangement tying a customer to a supplier is that, by foreclosing the competitors of either party from a segment of the market otherwise open to them, the arrangement may act as a 'clog on competition,' *Standard Oil Co. of California* v. *United States,* 337 U.S. 293, 314 [93 L.Ed. 1371, 1386, 69 S.Ct. 1051], which 'deprives[s] . . . rivals of a fair opportunity to compete.' " (Fn. deleted; quoted in *Ford Motor Co.* v. *United States* (1972) 405 U.S. 562, 570 [31 L.Ed.2d 492, 500, 92 S.Ct. 1142]; see also *FTC* v. *Procter & Gamble Co.* (1967) 386 U.S. 568, 578 [18 L.Ed.2d 303, 310, 87 S.Ct. 1224].) While employing a multifactor analysis, the courts have examined the degree to which vertical acquisitions "may increase barriers to entry into the market or reduce competition by . . . foreclosing competitors of the selling firm . . . from access to the market or a substantial portion of it, . . ." (*Fruehauf Corp.* v. *F. T. C.* (2d Cir. 1979) 603 F.2d 345, 352; *Mississippi River Corporation* v. *F. T. C.* (8th Cir. 1972) 454 F.2d 1083, 1091; *Crouse-Hinds Co.* v. *Internorth, Inc.* (N.D.N.Y. 1980) 518 F.Supp. 416, 430.)[12]

In *United States* v. *Topco Associates* (1972) 405 U.S. 596 [31 L.Ed.2d 515, 92 S.Ct. 1126], holding a horizontal system of territorial restraints to be a per se violation of the Sherman Act, the Supreme Court again invoked the

---

[12] Since the 1950 amendments to the Clayton Act, antitrust litigation in this field has generally relied on the relatively expansive provisions of the Clayton Act, section 7, but the same analysis applies to the Sherman Act, section 1. (*Intern. Tel. & Tel. Corp.* v. *General Tel. & Elect. Corp.* (D.Haw. 1978) 449 F.Supp. 1158, 1173.)

entrepreneur's right to freely compete in new or expanded markets. "Antitrust laws in general, and the Sherman Act in particular, are the Magna Carta of free enterprise. They are as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms. And the freedom guaranteed each and every business, no matter how small, is the freedom to compete—to assert with vigor, imagination, devotion, and ingenuity whatever economic muscle it can muster. Implicit in such freedom is the notion that it cannot be foreclosed with respect to one sector of the economy . . . ." (*Id.* at p. 610 [31 L.Ed.2d at p. 527].) In another context, Justice Douglas similarly observed, "[a] nation of clerks is anathema to the American antitrust dream." (*United States* v. *Falstaff Brewing Corp.* (1973) 410 U.S. 526, 543 [35 L.Ed.2d 475, 488, 93 S.Ct. 1096], conc. opn.)

In the field of vertical restraints, the Supreme Court has said that restrictions may be justified under the rule of reason if they are "the only practicable means a small company has for breaking into or staying in business." (*White Motor Co.* v. *United States* (1963) 372 U.S. 253, 263 [9 L.Ed.2d 738, 746, 83 S.Ct. 696].) Similarly, tying arrangements that would otherwise offend antitrust law have been sanctioned as a means of a firm gaining entry into a market: "Thus, unless the tying device is employed by a small company in an attempt to break into a market [citation], the use of a tying device can rarely be harmonized with the strictures of the antitrust laws, . . ." (*Brown Shoe Co.* v. *United States, supra,* 370 U.S. 294, 330 [8 L.Ed.2d 510, 538-539]; fn. deleted.) In *Standard Oil Co.* v. *United States, supra,* 337 U.S. 293, on facts presenting an analogy to the case at bar, the court held that exclusive supply contracts violated section 3 of the Clayton Act.[13] Although Standard Oil did not itself dominate the retail market, the other major distributors employed similar exclusive dealing agreements. The court observed, "[w]hen it is remembered that all the other major suppliers have also been using requirements contracts, and when it is noted that the relative share of the business which fell to each has remained about the same during the period of their use, it would not be farfetched to infer that their effect has been to enable the established suppliers individually to maintain their own standing and at the same time collectively, even though not collusively, to prevent a late arrival from wresting away more than an insignificant portion of the market." (*Id.* at p. 309 [93 L.Ed. at pp. 1383-1384]; fn. deleted.)

---

[13] Although the court did not reach the issue of Sherman Act violation, the decision is relevant to the Cartwright Act. Business and Professions Code section 16727 is patterned after section 3 of the Clayton Act. (*Corwin* v. *Los Angeles Newspaper Service Bureau, Inc.* (1971) 4 Cal.3d 842, 853 [94 Cal.Rptr. 785, 484 P.2d 953].)

A recent decision of the California Supreme Court interpreting the Cartwright Act draws attention to the antitrust law policy of securing free access to markets. In *Marin County Bd. of Realtors, Inc.* v. *Palsson, supra,* 16 Cal.3d 920, the court discussed restrictions imposed by a county board of realtors, "limiting its membership to persons primarily engaged in the real estate business and . . . denying nonmembers access to its multiple listing service." (*Id.* at p. 924.) The court noted, "[a]nother beneficiary of the antitrust law is the competitor himself. The preservation of competition, while indirectly aiding society by producing lower prices and higher quality goods and services, directly aids the scrupulous trader by insuring him a fair opportunity to compete on the market." (*Id.* at p. 935.) Under this standard, it held the restrictions to violate the Cartwright Act: "The problems of a nonmember of the board in competing against this colossus are manifest. . . . [O]ne does not need an advanced degree in economics to predict whose services a buyer or seller of a home is likely to engage. The access rule, in short, seriously hampers the competitive effectiveness of nonmember licensed brokers and salesmen." (*Id.* at pp. 935-936; fn. deleted.)

It will be recalled that the discussion of circuit dealing in *United States* v. *Paramount Pictures, supra,* 334 U.S. 131, turned essentially on the question of free access to markets. Referring to the two prevailing forms of circuit dealing, the Supreme Court stated, "they eliminate the opportunity for the small competitor to obtain the choice first runs, and put a premium on the size of the circuit. They are, therefore, devices for stifling competition and diverting the cream of the business to the large operators." (*Id.* at p. 154 [92 L.Ed. at p. 1291].) *Paramount Pictures* remains the governing law on the subject, and it is evident that the concern expressed by the court has not subsided.

We conclude that the alleged agreements with Paramount Pictures and Warner Bros., if proved, would present a triable issue of an unreasonable restraint of trade under the Cartwright Act. (Bus. & Prof. Code, § 16720.) "Whether a restraint of trade is reasonable is a question of fact to be determined at trial." (*Corwin* v. *Los Angeles Newspaper Service Bureau, Inc. supra,* 4 Cal.3d 842, 855.) The summary judgment is reversed as to these defendants. In this appeal we do not need to consider whether appellant has presented a triable issue as to the *existence* of the alleged agreements. By denying appellant's motion to compel production of cutoff cards, the trial court has deprived it of potentially probative evidence. It would be unfair to hold that it has failed to present a triable issue of fact as to the existence of the agreements while denying it a promising avenue of proof. On remand, appellant should be allowed to renew its discovery motion, but if the motion fails to yield the probative evidence

appellant predicts, our decision is not intended to preclude respondent from moving again for summary judgment on the ground that there is no triable issue of fact as to the existence of the alleged agreements.

■ We find no triable issue, however, as to defendant Orion. The distributor came into corporate existence in 1983 as the successor of a company called Filmways. During the period covered by the complaint, it achieved only a 3 percent market share. Most significant, none of its films were among the big money-makers in this period.[14] As Orion is itself a new entrant and a relatively marginal participant in the industry, it would be anomalous to hold that it was responsible for imposing barriers to fair competition among exhibitors.

■ Lastly, the summary judgment should be affirmed with respect to appellant's fraud cause of action. The complaint fails to allege the essential elements of the tort and appellant's own affidavits tend to rebut both the existence of misrepresentation and action in reliance thereon.

The summary judgment in favor of defendants Festival Enterprises, Inc., Paramount Pictures and Warner Bros. is reversed as to the Cartwright Act cause of action and affirmed as to the fraud cause of action. The summary judgment in favor of defendant Orion is affirmed.

Appellant is entitled to costs on appeal.

Racanelli, P. J., and Holmdahl, J., concurred.

A petition for a rehearing was denied May 19, 1988, and the opinion was modified to read as printed above. Respondents' petitions for review by the Supreme Court were denied August 11, 1988.

---

[14] Appellant's claim of damages is based on failure to obtain five films from Orion. Of these, "The Terminator" ranked 25th in rentals in 1984 and "The Woman in Red" and "Breathless" each ranked 35th in rentals in 1984 and 1983 respectively.